Slip Op. 19-169

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRO-TEAM COIL NAIL ENTERPRISE, INC., ET AL., | |
| Plaintiffs, | |
| UNICATCH INDUSTRIAL CO., LTD., ET AL., | |
| Consolidated Plaintiffs, | Before: Mark A. Barnett, Judge |
| and | Consol. Court No. 18-00027 |
| S.T.O. INDUSTRIES, INC., | **PUBLIC VERSION** |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| MID CONTINENT STEEL & WIRE, INC., | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding in part and sustaining in part the final results of the U.S. Department of Commerce's first administrative review of the antidumping duty order on certain steel nails from Taiwan.]

Dated: December 19, 2019

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for Plaintiffs Pro-Team Coil Enterprise, Inc. and PT Enterprise Inc., Consolidated Plaintiffs Unicatch Industrial Co., Ltd. and TC International, Inc., and

Consolidated Plaintiffs Hor Liang Industrial Corp., and Romp Coil Nails Industries Inc. With him on the briefs were Max F. Shutzman and Andrew T. Schutz.

John R. Magnus, TradeWins LLC, of Washington, DC, argued for Consolidated Plaintiff PrimeSource Building Products, Inc.

Ronald M. Wisla, Lizbeth R. Levinson, and Brittney R. Powell, Fox Rothschild LLP, of Washington, DC, for Plaintiff-Intervenor S.T.O. Industries, Inc.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Natan P.L. Tubman, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam Gordon, The Bristol Group LLC, of Washington, DC, argued for Defendant-Intervenor Mid Continent Steel & Wire, Inc.  With him on the brief was Ping Gong.

Barnett, Judge:  This consolidated action is before the court on five motions for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2 challenging the final results of the U.S. Department of Commerce's ("Commerce" or "the agency") first administrative review of the antidumping duty order on certain steel nails from Taiwan.  *See Certain Steel Nails From Taiwan*, 83 Fed. Reg. 6,163 (Dep't Commerce Feb. 13, 2018) (final results of antidumping duty admin. review and partial rescission of admin. review; 2015-2016) ("*Final Results*"), ECF No. 20-2, and accompanying Issues and Decision Mem, A-583-854 (Feb. 6, 2018) ("I&D Mem."), ECF No. 20-3.[1]

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 20-4, and a Confidential Administrative Record ("CR"), ECF No. 20-5. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A. ("PJA"), ECF No. 54; Confidential J.A. ("CJA"), ECF Nos. 55 (Vol. I), 55-

Plaintiff Pro-Team Coil Nail Enterprise, Inc. ("Pro-Team") is a Taiwanese producer of subject merchandise; Plaintiff PT Enterprise Inc. ("PT") is Pro-Team's affiliated exporter.  PT and Pro-Team (together, "PT/Pro-Team") contest Commerce's use of total facts otherwise available with an adverse inference (referred to as "total adverse facts available" or "total AFA") on the basis that PT/Pro-Team failed to timely provide quantity and value ("Q&V") figures concerning Pro-Team's home market sales and never provided the figures in the form and manner requested.  Confidential Pls.' Mot. for J. on the Agency R., ECF No. 30, and Confidential Mem. of Law in Supp. of [] Pls.', Pro-Team Coil Nail Enter., Inc. and PT Enter. Inc. Mot. for J. on the Agency R. ("PT/Pro-Team's Mem."), ECF No. 30; Confidential Pl. PT's Reply to Def.'s Opp'n to PT's Mot. for J. on the Agency R. ("PT/Pro-Team's Reply"), ECF No. 44.

Consolidated Plaintiff Unicatch Industrial Co., Ltd. ("Unicatch") is a Taiwanese producer of subject merchandise; Consolidated Plaintiff TC International, Inc. ("TC Int'l") is Unicatch's affiliated U.S. reseller.  Unicatch and TC Int'l (together, "TC/Unicatch") contest Commerce's use of total AFA to determine Unicatch's margin after concluding that Unicatch failed to provide a complete cost reconciliation.  Confidential Pls.' Mot. for J. on the Agency R., ECF No. 32, and Confidential Mem. of Law in Supp. of Consol. Pls', Unicatch Indus. Co., Ltd. and TC Int'l, Inc. Mot. for J. on the Agency R. ("TC/Unicatch's Mem."), ECF No. 32; Confidential Pl. Unicatch's Reply to Def.'s Opp'n to Unicatch's Mot. for J. on the Agency R. (TC/Unicatch's Reply"), ECF No. 46.

---

1 (Vol. II), 55-2 (Vol. III), 55-3 (Vol. IV).  The court references the confidential version of the relevant record documents, unless otherwise specified.

Consolidated Plaintiff PrimeSource Building Products, Inc. ("PrimeSource"), a U.S. importer of subject merchandise, contests Commerce's decision to assign PT/Pro-Team and Unicatch rates based on total adverse facts available.  Mot. for J. Upon the Agency R. under Rule 56.2 of Consol. Pl. PrimeSource Building Prods., Inc., ECF No. 29, and Mem. of P&A in Supp. of Rule 56.2 Mot. for J. on the Agency R by Consol. Pl. PrimeSource Building Prods. Inc. ("PrimeSource's Mem."), ECF No. 29-1; Pl. PrimeSource's Resp. to Def.'s Opp'n to Mot. for J. on the Agency R. ("PrimeSource's Reply"), ECF No. 43.

Consolidated Plaintiffs Hor Liang Industrial Corp. ("Hor Liang") and Romp Coil Nails Industries ("Romp") (together, "HL/Romp") are Taiwanese producers and exporters of subject merchandise that were not selected for individual examination and received the "all-others" rate based on PT/Pro-Team's and Unicatch's adverse rates. HL/Romp challenge Commerce's summary denial of their ministerial error allegation and seek to preserve their right to obtain a revised rate in the event that PT/Pro-Team or TC/Unicatch succeed in their challenges.  Pls.' Mot. for J. on the Agency R., ECF No. 34, and Mem. of Law in Supp. of Consol. Pls., Hor Liang Indus. Corp. and Romp Coil Nails Indus. Inc. Mot for J. on the Agency R. ("HL/Romp's Mem.") at 2, ECF No. 34; Pls. Hor Liang Indus. Corp. and Romp Coil Nails Indus. Inc.'s Reply to Def.'s Opp'n to Pls.' Mot. for J. on the Agency R., ECF No. 48.

Plaintiff-Intervenor S.T.O. Industries, Inc. ("S.T.O. Industries"), a U.S. importer of subject merchandise, supports the motions filed by PT/Pro-Team and TC/Unicatch. *See* Pl.-Int.'s Mot. for J. on the Agency R. ("S.T.O.'s Mot."), ECF No. 35.

Defendant United States ("the Government") and Defendant-Intervenor Mid

Continent Steel & Wire, Inc. ("Mid Continent"), a domestic producer of subject

merchandise and the petitioner in the underlying proceeding, defend the *Final Results*.

Confidential Def.'s Mem. in Opp'n to Pls.' R. 56.2 Mots. for J. upon the Admin. R.

("Gov't's Resp."), ECF No. 37; Def.-Int.'s Resp. Br. ("Mid Continent's Resp."), ECF No.

42.

For the reasons discussed herein, the court remands Commerce's use of the

facts otherwise available with respect to PT/Pro-Team; remands Commerce's use of an

adverse inference when selecting from among the facts otherwise available with respect

to Unicatch; declines to reach HL/Romp's first claim; and defers resolving HL/Romp's

second claim.

## BACKGROUND

In July 2015, Commerce issued an order imposing antidumping duties on certain

steel nails from Taiwan.  *See Certain Steel Nails From the Republic of Korea, Malaysia,*

*the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg.

39,994, 39,996 (Dep't Commerce July, 13, 2015) (antidumping duty orders).  In

September 2016, Commerce initiated the first administrative review of that order.

*Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 81 Fed. Reg. 62,720

(Dep't Commerce Sept. 12, 2016).  The period of review ("POR") was May 20, 2015,

through June 30, 2016.  *Id.* at 62,722.

Commerce initially selected PT and Bonuts Hardware Logistics Co., LLC

("Bonuts") as mandatory respondents.  Selection of Respondents for the 2015–2016

Admin. Review of the Antidumping Duty Order on Certain Steel Nails from Taiwan (Nov.

29, 2016) at 1, PR 38, CJA Vol. I, Tab 3.  On February 9, 2017, Commerce selected

Unicatch as an additional mandatory respondent after Bonuts indicated its intent not to

participate in the review.  Selection of Additional Mandatory Respondent (Feb. 9, 2017)

at 1, 3–4, PR 76, CJA Vol. II, Tab 17.

On August 7, 2017, Commerce published its preliminary results.  *Certain Steel*

*Nails From Taiwan*, 82 Fed. Reg. 36,744 (Dep't Commerce Aug. 7, 2017) (prelim.

results of antidumping duty admin. review and partial rescission of admin. review; 2015–

2016) ("*Preliminary Results*"), PR 154, PJA Tab 29.  Commerce used total adverse

facts available to assign PT/Pro-Team and Bonuts preliminary weighted-average

dumping margins of 78.17 percent—the dumping margin alleged in the petition

underlying the original investigation.  *Id.* at 36,744–45; Decision Mem. for Prelim.

Results of Antidumping Duty Admin. Review (July 31, 2017) ("Prelim. Mem.") at 12–13,

PR 155, PJA Tab 30.  Commerce preliminarily calculated a company-specific weighted-

average dumping margin of 34.20 percent for Unicatch.  *Prelim. Results*, 82 Fed. Reg.

at 36,745.  In accordance with 19 U.S.C. § 1673d, Commerce preliminarily assigned

Unicatch's calculated rate to Romp and Hor Liang.  *Prelim. Results*, 82 Fed. Reg. at

36,744.[2]

---

[2] To calculate dumping margins for non-examined companies—such as Romp and Hor
Liang—Commerce is guided by 19 U.S.C. § 1673d(c)(5).  *See Prelim. Results*, 82 Fed.
Reg. at 36,744.  By its terms, 19 U.S.C. § 1673d applies to market economy
investigations, not administrative reviews.  As a general rule, however, Commerce looks
to section 1673d(c)(5) for guidance when calculating the rate for non-examined
companies in administrative reviews.  *See* I&D Mem. at 5.  Section 1673d(c)(5)(A)

Commerce published the *Final Results* on February 13, 2018.  In a change from the *Preliminary Results*, Commerce used total AFA to determine the rate for Unicatch as well as PT/Pro-Team and Bonuts; thus, all individually-examined respondents received final dumping margins of 78.17 percent.  *Id.* at 6,164.  Consequently, the all-others rate assigned to Romp and Hor Liang increased to 78.17 percent to reflect "the rate determined for all mandatory respondents."  *Id.* at 6,164; *see also supra*, note 2.

On February 20, 2018, Romp and Hor Liang filed ministerial error comments regarding Commerce's calculation of the all-others rate.  *See* Romp/HR Liang's Rejected Req. to Correct Clerical Error (Feb. 20, 2018), PR 196, PJA Tab 49.  On February 27, 2018, Commerce rejected Romp and Hor Liang's ministerial error allegation.  Rejection of Submission (Feb. 27, 2018), PR 209, PJA Tab 54.  Commerce explained that it had not made a ministerial error as that term is defined by statute and regulation, and, "[b]ased upon [its] analysis of the comments received, [] will not amend [Romp's and Hor Liang's] margins."  *Id.*  The following day, Commerce removed the ministerial error allegation from the administrative record.  Rejection of Submissions

---

provides that the "all-others rate" assigned to non-examined companies is calculated as "the weighted average of the estimated weighted average dumping margins" assigned to individually-examined companies, "excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title [*i.e.*, on the basis of adverse facts available]."  19 U.S.C. § 1673d(c)(5)(A).  If, however, the dumping margins assigned to all individually-examined companies are zero, de minimis, or based on adverse facts available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  *Id.* § 1673d(c)(5)(B).

(Feb. 28, 2018), PR 207, PJA Tab 52.  On March 15, 2018, Commerce denied

HL/Romp's request to reinstate their ministerial error allegation on the administrative

record.  Rejection of Submission (Mar. 15, 2018), PR 215, PJA Tab 57.

In February 2018, PT/Pro-Team, TC/Unicatch, HL/Romp, and PrimeSource

commenced actions challenging the *Final Results*.  Summons, ECF No. 1; *Unicatch*

*Indus. Co., Ltd., et al. v. United States*, No. 18-cv-00028 (CIT Feb. 22, 2018); *Hor Liang*

*Indus. Corp., et al. v. United States*, No. 18-cv-00029 (CIT Feb. 22, 2018); *PrimeSource*

*Building Prods., Inc. v. United States*, No. 18-cv-00030 (CIT Feb. 23, 2018).  On

September 24, 2018, the court denied the Government's motion to dismiss HL/Romp's

complaint pursuant to CIT Rule 12(b)(1) for lack of subject matter jurisdiction and

granted S.T.O. Industries' motion to intervene.  *Hor Liang Indus. Corp. v. United States*,

42 CIT ___, ___, 337 F. Supp. 3d 1310, 1329 (2018).  The court also dismissed counts

one and three of HL/Romp's amended complaint for failure to exhaust administrative

remedies.  *Id.* at 1324–28.  On September 27, 2018, the court consolidated the actions

under lead court no. 18-00027.  Order (Sept. 27, 2018), ECF No. 25.

The court heard oral argument on the pending motions on November 21, 2019.

Docket Entry, ECF No. 60.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[3] and 28 U.S.C. § 1581(c).

---

[3] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition.  However, The Trade

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

### I.   Commerce's Authority to Determine Margins Based on Total Adverse Facts Available

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce," "fails to provide" requested information by the submission deadlines "or in the form and manner requested," "significantly impedes a proceeding," or provides information that cannot be verified, Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).

Commerce's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d).  *See id.*  According to subsection 1677m(d), if Commerce

> determines that a response to a request for information . . . does not comply with the request, [Commerce] shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews . . . .

Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015), made several amendments to the antidumping and countervailing duty laws. Section 502 of the TPEA amended 19 U.S.C. § 1677e.  *See* TPEA § 502.  The TPEA amendments affect all antidumping duty determinations made on or after August 6, 2015.  *See* Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6, 2015).  Accordingly, all references to 19 U.S.C. § 1677e are to the amended version of the statute.

*Id*.  If the respondent's subsequent submission is also deficient or untimely, Commerce

may "disregard all or part of the original and subsequent responses," subject to

subsection 1677m(e).  *Id.*

Section 1677m(e) provides that Commerce may not "decline to consider

information that is . . . necessary to the determination but does not meet all the

applicable requirements" when the information is timely submitted; "the information can

be verified"; "the information is not so incomplete that it cannot serve as a reliable basis

for reaching the applicable determination"; the proponent of the information "has

demonstrated that it acted to the best of its ability in providing the information and

meeting the requirements established by [Commerce]"; and "the information can be

used without undue difficulties."  *Id.* § 1677m(e).

Additionally, when Commerce determines that a respondent "has failed to

cooperate by not acting to the best of its ability to comply with a request for information,"

it "may use an inference that is adverse to the interests of that party in selecting from

among the facts otherwise available."  *Id.* § 1677e(b).  "Compliance with the 'best of its

ability' standard is determined by assessing whether a respondent has put forth its

maximum effort to provide Commerce with full and complete answers to all inquiries in

an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.

2003);[4] *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275–76 (Fed. Cir. 2012).

Commerce generally uses total adverse facts available to determine dumping margins when "none of the reported data is reliable or usable." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citation omitted); *see also Nat'l Nail Corp. v. United States,* 43 CIT ___, ___, 390 F. Supp. 3d 1356, 1374 (2019) (explaining that "Commerce uses 'total adverse facts available'" when it applies "adverse facts available not only to the facts pertaining to specific sales or information . . . not present on the record, but to the facts respecting all of respondents' production and sales information that the [agency] concludes is needed for an investigation or review") (citation omitted).

## II.   Commerce's Use of Total AFA to Determine PT/Pro-Team's Margin

### A.  Additional Background

Dumping margins are determined generally from the difference between the normal value and the export price or constructed export price of the subject merchandise.  *See* 19 U.S.C. § 1673.  To calculate normal value, Commerce typically uses "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or

---

[4] *Nippon Steel* predates the TPEA. However, the relevant statutory language discussed in that case remains unchanged.  *Compare* 19 U.S.C. § 1677e(b) (2012), *with* 19 U.S.C. § 1677e(b)(1) (2015).

constructed export price." *Id.* § 1677b(a)(1)(B)(i).  However, if "the aggregate quantity

(or value) of the foreign like product sold in the exporting country . . . is less than 5

percent of the aggregate quantity (or value) of sales of the subject merchandise to the

United States," *id.* § 1677b(a)(1)(C), Commerce may look to third country sales or base

normal value on constructed value ("CV"),[5] *id.* § 1677b(a)(1)(B)(ii), (a)(1)(C), (a)(4); *see*

*also* 19 C.F.R. § 351.404(a)–(b).[6]

Accordingly, in order to ascertain the proper basis for determining normal value,

Commerce instructed PT/Pro-Team to report the quantity and value of subject

merchandise sold during the period of review in or to the United States.  Req. for

Information (Nov. 29, 2016) at A-1, PR 39–41, CJA Vol. I, Tab 4.  Commerce further

instructed:

> If your home market does not meet the five percent threshold . . . , report
> the sales to each of the three largest (by volume) third-country markets
> (provided each meets the five percent threshold) in the [Q&V] chart . . . .  If
> the volume of your largest third-country market sales of the foreign like
> product is also less than five percent of the volume of your sales to the
> United States of the subject merchandise, do not report this market.  If this
> is the case, you are required to respond to section D of this questionnaire.

*Id.* at A-2.  PT/Pro-Team reported that it had no sales in the home market or any third

country markets and, thus, Pro-Team would respond to Commerce's section D

questionnaire.  PT Enter. Sec. A Resp. (Jan. 4, 2017) ("PT's AQR") at 3, CR 8–16, PR

---

[5] Constructed value consists of the cost of production, selling, general, and
administrative expenses, profit, and other expenses incidental to preparing the subject
merchandise for export to the United States.  19 U.S.C. § 1677b(e).

[6]  Commerce typically considers sufficiency in terms of the aggregate *quantity* of sales
in the home market but will consider the aggregate *value* of sales "if quantity is not
appropriate."  19 C.F.R. § 351.404(b)(2).

57–59, CJA Vol. I, Tab 10.  PT/Pro-Team provided a Q&V chart reflecting PT's sales to the United States.  *Id.* at Ex. A-1.

PT/Pro-Team's section C questionnaire response contained additional information regarding its sales to the United States.  PT Enter. Sec. C Resp. (Jan. 19, 2017) ("PT's CQR"), CR 23–25, PR 70, CJA Vol. II, Tab 12.  However, the sales reconciliation worksheet appended to that response contained a summary amount reflecting POR sales of subject merchandise in the home market.  *Id.*at Ex. C-2, Sales Reconciliation Worksheet, Sec. II, Line Item I.4.[7]  Accompanying spreadsheets disaggregated PT's and Pro-Team's respective sales to U.S. and Taiwanese markets. *See id.*

Commerce issued PT/Pro-Team a supplemental questionnaire seeking clarification as to whether Pro-Team or PT sold "the merchandise under review" in the domestic market and, if so, to identify all such products.  PT Enter. Secs. A–D Suppl. Questionnaire Resp. (Apr. 21, 2017) ("PT's 1st Suppl. QR") at 8–9, CR 37–38, PR 109, CJA Vol. II, Tab 23.  PT/Pro-Team responded that Pro-Team sold the merchandise at issue to domestic resellers for export, but PT did not have any domestic sales.  *Id.* PT/Pro-Team submitted a list of all products sold by Pro-Team in the domestic market. *Id.* at Ex. SA-7.

---

[7] The worksheet indicates that Pro-Team sold NT$[[                    ]]—equal to U.S.$ [[                ]]—worth of subject merchandise in Taiwan for the combined calendar year 2015 and January to June 2016.  PT's CQR at Ex. C-2, Sales Reconciliation Worksheet, Sec. II, Line Item I.4.  The domestic sales value equals about [[    ]] percent of PT's U.S.$ [[              ]] in sales to the United States.  *See id.*

Soon thereafter, Mid Continent submitted a letter to Commerce in which it identified the inconsistency between PT/Pro-Team's section A questionnaire response regarding the lack of home market sales and PT/Pro-Team's supplemental questionnaire response acknowledging sales in the domestic market.  Comments on PT Enter. Inc. and Pro-Team Coil Nail Enter., Inc.'s Suppl. Secs. A, C, and D Questionnaire Resp. (May 1, 2017) at 2, CR 45, CJA Vol. III, Tab 26.  Mid Continent requested Commerce to instruct PT/Pro-Team to provide revised Q&V data to the extent the products sold in the home market constituted subject merchandise in order to "confirm that its home market remains non-viable" as the basis for normal value.  *Id.*

Commerce issued PT/Pro-Team a second supplemental questionnaire requesting: (1) "a detailed description of each of the products listed" in Exhibit SA-7 (products sold in the home market by Pro-Team); (2) an explanation "why the product is not subject merchandise"; (3) and, to the extent any products listed in Exhibit SA-7 are subject merchandise, revised home market Q&V figures.  Suppl. Questionnaire (May 16, 2017) at 4, CR 49, PR 119, CJA Vol. III, Tab 29.  PT/Pro-Team responded that all products listed in Exhibit SA-7 consisted of subject merchandise and provided a detailed description of each in Exhibit SS-5.  PT Enter. Second Suppl. Questionnaire Resp. (June 6, 2017) ("PT's 2nd Suppl. QR") at 3, CR 56–65, PR 135–136, CJA Vol. III, Tab 36.  PT/Pro-Team did not, however, provide revised Q&V figures.  *See id.*

Mid Continent alerted Commerce to PT/Pro-Team's failure to provide the revised Q&V figures and urged Commerce to use total AFA on the basis that PT/Pro-Team's omission "fully supports an inference that its home market in fact is viable, because

otherwise PT would have reported the data requested."  Initial Comments on PT Enter.

Inc. and Pro-Team Coil Nail Enter., Inc.'s Second Suppl. Questionnaire Resp. (June 9,

2017) at 3–4, PR 139, PJA Tab 24.  PT/Pro-Team sought to rebut Mid Continent's

assertion, explaining that its omission of home market Q&V data from the chart

appended to its initial section A questionnaire response and its statement that it did not

sell the merchandise under review in the home market resulted from its failure to

account for Pro-Team's home market sales.  PT Enter./Pro-Team Resp. to Pet'r's Initial

Comments on PT and Pro-Team's Second Suppl. Questionnaire Resp. (June 14, 2017)

("PT's Rebuttal Cmts.") at 2 n.1, CR 72–73, CJA Vol. IV, Tab 40.  PT/Pro-Team also

stated that it had "inadvertently neglected" to include revised Q&V figures in its second

supplemental questionnaire response, *id.* at 2 n.2, and attached a schedule reflecting

Q&V data for Pro-Team's POR domestic sales of subject merchandise, *id.* at Ex. P-2

("the Q&V Schedule").  PT/Pro-Team further explained that Q&V data for Pro-Team's

home market sales was on the record since it filed its original sections C and D

questionnaire responses in January 2017.  *Id.* at 3–4 (citing PT's CQR, Ex. C-2; PT

Enter. Sec. D Resp. (Jan. 19, 2017) ("PT's DQR") at Ex. D-7.2, CR 26–27, CJA Vol. II,

Tab 13).  PT/Pro-Team noted that the total quantity of home market sales was "clearly

*de minimis*, well below the 5 [percent] threshold, and [] the [agency]'s use of constructed

value to determine normal value, as it did during the [original] investigation, is absolutely

appropriate." *Id.* at 4.[8]   Commerce rejected PT/Pro-Team's arguments and

preliminarily used total AFA to determine PT/Pro-Team's margin.  *Prelim. Results*, 82

Fed. Reg. at 36,744–45.

PT/Pro-Team filed an administrative case brief in which it argued, *inter alia*, that

judicial precedent from the U.S. Court of Appeals for the Federal Circuit ("Federal

Circuit") required Commerce to weigh the principles of finality and accuracy before

disregarding the Q&V Schedule and using total AFA.  Admin. Case Br. of PT (Sept. 22,

2017) at 17–20, CR 93, PR 175, CJA Vol. IV, Tab 57 (discussing *NTN Bearing Corp. v.*

*United States*, 74 F.3d 1204, 1205, 1206–08 (Fed. Cir. 1995), *Timken U.S. Corp. v.*

*United States*, 434 F.3d 1345, 1346–48 (Fed. Cir. 2006), and their progeny).[9]

Commerce denied PT/Pro-Team's request and continued to use total AFA to determine

PT/Pro-Team's final dumping margin.  I&D Mem. at 11–15.  Commerce reasoned that

*NTN Bearing* and *Timken* were inapplicable on the basis that the "issues" in this case

"go far beyond mere clerical errors."  *Id.* at 14 & nn.48–52 (citations omitted).

---

[8] Specifically, Pro-Team sold [[          ]] kilograms of subject merchandise in the home market, which represents [[     ]] percent of PT's U.S. sales quantity.  PT's Rebuttal Cmts. at 4.

[9] *NTN Bearing* held that Commerce abused its discretion when it refused to consider corrections to clerical errors based on the untimely submission of the corrective information submitted soon after Commerce issued its preliminary determination.  74 F.3d at 1207–09.  *Timken* found that Commerce erred in initially refusing to consider correcting errors identified after the preliminary determination but before the final determination.  434 F.3d at 1351–54 (affirming the CIT's remand to the agency for reconsideration of its initial position).  Nevertheless, the *Timken* court sustained Commerce's subsequent decision not to utilize the corrective information.  434 F.3d at 1351–57.

Regarding its authority to use the facts otherwise available, Commerce concluded that PT/Pro-Team's failure to submit home market Q&V information within the time provided or in the form and manner requested meant that "the record lacks the necessary information to determine the viability of PT/Pro-Team's home market or the accuracy of the reported data." *Id.* at 13.  Commerce further found that "PT/Pro-Team withheld certain home market sales data that was requested by Commerce" and "significantly impeded the proceeding by requiring multiple questionnaires to address the basic threshold issue" of home market viability.  *Id.*  Commerce determined to use *total* facts otherwise available "because 'the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts [available] without undue difficulty.'"  *Id.* at 14 & n.45 (quoting *Mukand Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014)).  Commerce further concluded that PT/Pro-Team's conduct surrounding its belated submission of home market Q&V figures meant that the "requirements of [19 U.S.C. § 1677m(d) and (e)] have been satisfied" and the use of "total AFA is warranted."  *Id.* at 14.

### B.  Commerce Must Reconsider its Decision to Use Total AFA

PT/Pro-Team contends that Commerce abused its discretion when it disregarded the Q&V Schedule; Commerce's conclusions that PT/Pro-Team withheld information, failed to provide information within the time provided or in the form and manner requested, or significantly impeded the proceeding are unsupported by substantial evidence; and the record likewise does not support Commerce's use of an adverse inference.  PT/Pro-Team's Mem. at 19–44; PT/Pro-Team's Reply at 8, 11–21.

PrimeSource advances substantially similar arguments.  *See* PrimeSource's Mem. at 5–

17; PrimeSource's Reply at 7–16.  S.T.O. Industries adopts by incorporation PT/Pro-

Team's arguments.  S.T.O.'s Mot. at 1.

The court finds that Commerce's determination that the "record lacks the

necessary information to determine the viability of PT/Pro-Team's home market or the

accuracy of the reported data," I&D Mem. at 13, is unsupported by substantial evidence.

Thus, this matter is remanded for further consideration.

As previously noted, Commerce did not reject the Q&V Schedule (or the rebuttal

comments to which it was appended) on the basis that it contained untimely filed factual

information pursuant to its regulatory authority to reject such information.  *See* I&D

Mem. at 13–14; 19 C.F.R. § 351.302(d)(1)(i).[10]  Rather, Commerce disregarded the

Q&V Schedule because PT/Pro-Team submitted the information seven days after the

deadline for its second supplemental questionnaire response and failed to submit the

information in the form and manner requested.  *See* I&D Mem. at 13.[11]  Section 1677e

---

[10] For this reason, the Government's assertion that Commerce properly disregarded the
Q&V Schedule because it contained untimely new factual information is impermissible
*post hoc* reasoning the court may not consider.  *See Burlington Truck Lines, Inc. v.
United States*, 371 U.S. 156, 168–69 (1962); Gov't Resp. at 23–24.

[11] Commerce's determination that PT/Pro-Team "withheld" home market sales data, I&D
Mem. at 13, is unsupported by substantial evidence.  PT/Pro-Team provided information
related to Pro-Team's domestic sales in its section C questionnaire response, first and
second supplemental questionnaire responses, and, finally, in the Q&V Schedule.  *See*
PT's CQR at Ex. C-2; PT's 1st Suppl. QR at 8–9, Ex. SA-7; PT's 2nd Suppl. QR at 3,
Ex. SS-5; Q&V Schedule.

Commerce's determination that PT/Pro-Team "significantly impeded the
proceeding," I&D Mem. at 13, 14, is also unsupported by substantial evidence.
Commerce supports its finding with several conclusory sentences but fails to specify
any particular impediment.  *See id.*  The issuance of supplemental questionnaires is not

permits Commerce to use the facts otherwise available when a respondent "fails to

provide [necessary] information by the deadlines for submission of the information or in

the form and manner requested"; however, that authority is subject to 19 U.S.C.

§ 1677m(e) and a remand is required for Commerce to conduct the proper analysis

required by that statutory provision.

Commerce's assertion that the statutory requirements for section 1677m(e)

"have been satisfied," I&D Mem. at 14, is largely conclusory and there is no indication

that Commerce considered whether the Q&V Schedule "is not so incomplete that it

cannot serve as a reliable basis for reaching the applicable determination" or whether it

"can be used without undue difficulties," 19 U.S.C. § 1677m(e)(3),(5).  Moreover,

Commerce's reliance on the untimeliness of PT/Pro-Team's filing to disregard the

---

uncommon and, as Commerce has elsewhere acknowledged, while its "strive[s] to
make viability determinations early in an investigation or review, . . . there may be
instances in which the [agency] must delay or reconsider a decision on viability."
Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,358 (Dep't
Commerce May 19, 1997) (final rule); *see also id.* at 27,335 (noting several
circumstances potentially delaying viability determinations, such as when initial section
A questionnaire responses "are so incomplete as to hinder a party's ability to make a
market viability allegation, or the information necessary to make a market viability
allegation is not available as part of the section A response").  Commerce's conclusion
that PT/Pro-Team's conduct "resulted in Commerce having to fully extend the deadline
for the preliminary results," I&D Mem. at 14, is also unsupported by substantial
evidence.  Commerce extended the deadline for several reasons, including the "need
[for] additional time to fully consider petitioner's comments on the questionnaire
responses of the respondents" and because of the complexity of the case with regard to
"home market sales reporting, database revisions, and other issues such as the
appropriate calculation of constructed value profit."  Extension of Time Limit for Prelim.
Results of Antidumping Duty Admin. Review (June 27, 2017) at 1–2, PR 151, PJA Tab
27.  Moreover, Commerce never specified how extending the deadline for the
preliminary determination constituted a significant impediment.

information contained therein was an abuse of discretion and the agency's finding that

PT/Pro-Team failed to act to the best of its ability lacks substantial evidence.  I&D Mem.

13–15; *see also* 19 U.S.C. § 1677m(e)(1),(4).

Regarding the issue of untimeliness, it is well-settled that a deadline-setting

regulation that "is not required by statute may, in appropriate circumstances, be waived

and must be waived where failure to do so would amount to an abuse of discretion."

*NTN Bearing*, 74 F.3d at 1207.  Commerce erred in disregarding *NTN Bearing* and

*Timken* based on the agency's conclusion that PT/Pro-Team had not made a clerical

error.  I&D Mem. at 14; Gov't's Resp. at 22–23.[12]  "Commerce is free to correct *any* type

of [respondent] error—clerical, methodology, substantive, or one in judgment—in the

context of making an antidumping duty determination, provided that the [respondent]

seeks correction before Commerce issues its final results and adequately proves the

need for the requested corrections."  *Timken*, 434 F.3d at 1353  (emphasis added); *see*

*also Fischer S.A. Comercio, Industria and Agricultura v. United States*, 34 CIT 334, 346,

700 F. Supp. 2d 1364, 1375 (2010) ("*Timken* and *NTN Bearing* both stress that, at the

preliminary results stage, Commerce abuses its discretion where it refuses to let a

respondent establish an accurate dumping margin by correcting mistakes in its

response.").

---

[12] The Government's assertion that Commerce conducted the balancing required by
*NTN Bearing* and *Timken* when it "grant[ed] PT/Pro-Team multiple time extensions to
provide complete and accurate information" is disingenuous.  Gov't's Resp. at 23 (citing
I&D Mem. at 12–14).  Commerce clearly sought to distinguish *NTN Bearing* and *Timken*
and thereby avoid conducting that balancing.  I&D Mem. at 14.

When "reviewing Commerce's decision to reject corrective information" the court may consider "Commerce's interest in ensuring finality, the burden of incorporating the information, and consideration of whether the information will increase the accuracy of the calculated dumping margins." *Bosun Tools Co. v. United States*, Slip Op. 19-125, 2019 WL 4599805, at *4 (CIT Sept. 23, 2019). An evaluation of these factors has led the court to remand Commerce's refusal to consider corrective information (including information to correct an omission) submitted early in the proceeding. *See, e.g.*, *id.* at *4–5; *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 123–25, 815 F. Supp. 2d 1342, 1365–67 (2012); *Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT 1206, 1219–21, 865 F. Supp. 2d 1254, 1267–69 (2012); *Fischer S.A.*, 34 CIT at 346– 50, 700 F. Supp. 2d at 1375–77.

Applying those principles here leads to the conclusion that Commerce must reconsider its disregard of the Q&V Schedule. Finality concerns are not implicated because PT/Pro-Team submitted the Q&V Schedule before Commerce issued the *Preliminary Results* and almost eight months before Commerce issued the *Final Results*. *Cf. Timken*, 434 F.3d at 1353 ("This court, however, has never discouraged the correction of errors at the preliminary result stage; we have only balanced the desire for accuracy in antidumping duty determinations with the need for finality at the final results stage."). Any burden would appear to be minimal given that the Q&V Schedule summarized information already on the record and confirmed PT/Pro-Team's early assertion that normal value would be based on constructed value. *See* PT's AQR at 3; PT's CQR, Ex. C-2 (reflecting a *de minimis* Taiwanese dollar amount of home market

sales); Q&V Schedule (reflecting a *de minimis* volume of home market sales).  Lastly,

Commerce's summary assertion that "the record lacks the necessary information to

determine . . . the accuracy of the reported data," I&D Mem. at 13, is unaccompanied by

any examination of record evidence relevant to that assessment, *see* PT's Rebuttal

Cmts. at 3–4 (explaining how the Q&V figures were derived from existing record

evidence).  Absent any reason to question the veracity of the Q&V figures, accuracy

concerns favor accepting the Q&V Schedule for the purpose of determining PT/Pro-

Team's antidumping duty rate.  *Cf. F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v.*

*United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (noting that adverse rates contain

"some built-in increase intended as a deterrent to non-compliance").  Accordingly,

Commerce erred in disregarding the Q&V Schedule based on its untimeliness.

Regarding the issue of whether PT/Pro-Team acted to the best of its ability,

Commerce's explanation for its decision to use an adverse inference consisted of a

single paragraph that mischaracterized record facts and largely restated its reasons for

using *neutral* facts available.  *See* I&D Mem. at 14.  Commerce faulted PT/Pro-Team for

submitting conflicting information regarding its domestic sales in response to the

agency's supplemental questionnaires intended to afford PT/Pro-Team the

"opportunit[y] to remedy and explain the deficiencies in its reporting."  *See id.*

Commerce never identified the inconsistencies, however, and record evidence

demonstrates that PT/Pro-Team consistently reported Pro-Team's home market sales

of the merchandise at issue in its first and second supplemental questionnaire

responses.  PT's 1st Suppl. QR at 8–9; PT's 2nd Suppl. QR at 3.  Commerce further

found that "PT/Pro-Team did not respond to Commerce's *multiple* requests to revise its

quantity and value data within the appropriate deadlines."  I&D Mem. at 14 (emphasis

added).  However, Commerce issued a single request to PT/Pro-Team to revise its Q&V

figures in the agency's second supplemental questionnaire.  PT's 2nd Suppl. QR at 3.

More importantly, while Commerce concludes that these issues "significantly

impeded Commerce's ability the determine if there is a viable comparison market until

well into the proceeding," I&D Mem. at 14, it offers no further justification for its finding

that PT/Pro-Team failed to cooperate to the best of its ability in order to support the

agency's use of an adverse inference.  Commerce must do more than simply restate its

findings ostensibly supporting the use of neutral facts available to support the use of

adverse facts available.  *See, e.g.*, *Nat'l Nail Corp.*, 390 F. Supp. 3d at 1380; *Steel*

*Auth. of India, Ltd. v. United States*, 25 CIT 482, 488, 149 F. Supp. 2d 921, 930 (2001)

(remanding an AFA determination when the court could not discern Commerce's

reasons for finding that the respondent, "specifically, did not put forth its maximum

effort").

"[T]he antidumping laws are remedial not punitive."  *NTN Bearing*, 74 F.3d at

1208 (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–1104 (Fed. Cir.

1990)).  Consistent with this notion, "[t]he purpose of the adverse facts statute is 'to

provide respondents with an incentive to cooperate' with Commerce's investigation, not

to impose punitive damages."  *Essar Steel*, 678 F.3d at 1276 (quoting *F.lli De Cecco Di*

*Filippo Fara S. Martino S.p.A.*, 216 F.3d at 1032).  While "inattentiveness" or

"carelessness" may merit a finding that a respondent has failed to cooperate, the statute

"does not require perfection and recognizes that mistakes sometimes occur."  *Nippon Steel*, 337 F.3d at 1382.  "Commerce must devise a non-arbitrary way of distinguishing among errors" that merit an adverse inference and errors that do not.  *Nippon Steel Corp. v. United States*, 25 CIT 377, 382 n.10, 146 F. Supp. 2d 835, 841 n.10 (2001).

To that end, in the Issues and Decision Memorandum, Commerce stated that it has a practice of "consider[ing], in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation."  I&D Mem. at 12 & n.32 (citations omitted).  There is good reason for this practice, because it seeks to ensure that a "party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  *Viet I–Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1109 (Fed. Cir. 2016) (citation omitted).  There is no indication, however, that Commerce considered this issue in connection with its decision to disregard all of PT/Pro-Team's reported information and use total AFA.  Without more, Commerce's conclusion that PT/Pro-Team failed to "participate to the best of its ability," I&D Mem. at 15, is unsupported by substantial evidence, *see Nippon Steel*, 337 F.3d at 1382.

In sum, Commerce's authority to use the facts otherwise available—neutral or adverse—is circumscribed by 19 U.S.C. § 1677m(e).  In disregarding the Q&V Schedule, Commerce elevated form over substance without examining whether the information was sufficiently complete and usable without undue difficulties.  Commerce also failed to balance finality and accuracy considerations before dismissing the Q&V Schedule as untimely.  Finally, Commerce's determination that PT/Pro-Team failed to cooperate to the best of its ability lacks substantial evidence and reasoned explanation.

Accordingly, Commerce's decision to use total AFA to determine PT/Pro-Team's

dumping margin must be remanded for reconsideration.

### III.   Commerce's Use of Total AFA to Determine Unicatch's Margin

### A.  Additional Background

Commerce requests complete cost reconciliations from mandatory respondents

in order to "meaningfully analyze" the respondent's "section D questionnaire cost

response and calculate a reliable margin." I&D Mem. at 16.  Accordingly, Commerce

instructed Unicatch on how to reconcile its per-unit cost of production and constructed

value figures reported in the cost database "to the amounts recorded in [the

respondent's] cost accounting system and to the cost of manufacturing recorded in [the

respondent's] financial accounting system." Req. for Information (Nov. 29, 2016) ("Initial

QRE") at D-10, PR 42–44, CJA Vol. I, Tab 5.  Taking what it called a "top down"

approach, Commerce instructed Unicatch to submit reconciliation worksheets that

began with the "fiscal year income statement" and, ultimately, ended with the "total of

the per-unit manufacturing costs submitted to the [agency]." *Id.* at D-12 to D-13.

Additionally, Commerce instructed Unicatch to "identify and quantify the following

reconciling items": (1) the "differences between the reporting methodology and the

normal books and records"; (2) the "cost of merchandise not under consideration," *i.e.*,

non-subject merchandise; (3) the "cost of merchandise under consideration not sold in

the United States or comparison market"; (4) the "cost of merchandise under

consideration sold in the U.S. or comparison market that you have been excused from

reporting"; and (5) "all other reconciling items." *Id.* at D-13.

On January 19, 2017, Unicatch responded to the questionnaire.  Unicatch Sec.

[D] Resp. (Jan. 19, 2017) ("Unicatch's DQR"), CR 30–32, CJA Vol. II, Tab 15.  Unicatch

submitted a worksheet that reconciled the cost of sales reported in its financial

accounting system to its "POR Warehouse-Entries in Regular Production."  *Id.* at 28, Ex.

D-16.  Unicatch also submitted a worksheet listing the per-unit cost of manufacture for

all products it produced, which included subject and non-subject merchandise.  *Id.* at

Ex. D-17.  Unicatch informed Commerce that the costs reported in Exhibit D-17 "can tie"

to the data reported in its CV calculation worksheet.  *Id.* at 30, Ex. D-20.

Commerce issued Unicatch a supplemental questionnaire in which it requested

Unicatch to revise its cost reconciliation.  Suppl. Questionnaire (Mar. 27, 2017)

("Unicatch's 1st Suppl. QRE") at 9, CR 36, CJA Vol. II, Tab 20.  Commerce explained

that the submitted reconciliation "does not reconcile the sales from Unicatch's audited

financial statements . . . to the extended TOTCOM [i.e., total cost of manufacturing] in

the submitted cost database."  *Id.*  In response, Unicatch identified a clerical error in the

amount reported for its cost of sales and explained that its initial worksheet reconciled

its cost of sales to Unicatch's total cost of production for subject and non-subject

merchandise.  Unicatch Sec. A, C, D Suppl. Resp. (Apr. 25, 2017) ("Unicatch's 1st

Suppl. QR") at 17, CR 40–44, CJA Vol. II, Tab 25 (citing Unicatch's DQR, Ex. D-16).

Unicatch resubmitted an exhibit (Exhibit D-16 as Exhibit SD-9A) and provided additional

exhibits and information seeking to demonstrate that its reported per-unit costs

reconcile to its CV costs.  *Id.* at 17–18, Exs. SD-9B to SD-9E.

Commerce issued Unicatch a second supplemental questionnaire seeking further

clarification regarding Unicatch's cost reconciliation.  Specifically, Commerce directed

Unicatch to "revise [its] cost reconciliation in Exhibit SD-9A/Exhibit D-16" to, among

other things, "ensure that it starts with the cost of sales per your audited financial

statements . . . and ends with the total extended TOTCOM as per the submitted cost

database," and "[e]xplain and provide documentary support for each reconciling item."

Second Suppl. Questionnaire (May 16, 2017) ("Unicatch's 2nd Suppl. QRE") at 6, CR

48, CJA Vol. III, Tab 28.

Unicatch submitted a revised cost reconciliation worksheet that began with the

cost of sales from its financial statements and ended with its POR cost of production for

subject and non-subject merchandise.  Unicatch Sec. A, C, D Second Suppl. Resp.

(June 7, 2017) ("Unicatch's 2nd Suppl. QR") at Ex. SSD-3, CR 66–70, CJA Vol. IV, Tab

37.  The worksheet contained line items representing the aggregate cost of production

for different products that tied to unit costs reported in a separate worksheet (Exhibit

SSD-4) which, in turn, tied to Unicatch's revised CV costs (Exhibit SSD-2).  *Id.* at 15–16,

Exs. SSD-2, SSD-4.  Commerce relied on this information to calculate Unicatch's cost

of production for purposes of calculating a preliminary dumping margin.  Prelim. Mem.

at 20; *see also* Analysis for the Prelim. Results of the 2015–2016 Antidumping Duty

Admin. Review of Certain Steel Nails from Taiwan: Unicatch Indus. Co. Ltd. (July 31,

2017) at 3, CR 83–85, CJA Vol. IV, Tab 48.

In its administrative case brief, Mid Continent argued that Commerce should

apply partial AFA to Unicatch's reported costs because Unicatch failed to reconcile fully

its cost of sales to the total cost of manufacturing reported in the cost database.  Case

Br. (Sept. 22, 2017) at 36, CR 95, PR 177, CJA Vol. IV, Tab 59 (averring that Unicatch's

cost reconciliation "fails to demonstrate the final, crucial step of the reconciliation down

to the submitted costs").  Mid Continent also argued that Unicatch failed to fully explain

all "reconciling items" reflected in its cost reconciliation worksheet.  *Id.*  Mid Continent

suggested different ways in which Commerce might apply partial AFA to Unicatch's

reported costs.  *Id.* at 37.

In response, Unicatch explained that the cost of sales from its financial

statements and reflected in Exhibit SSD-3 links to its CV costs (detailed in Exhibit SSD-

2) through Exhibit SSD-4, which contains Unicatch's POR cost of production for all

product types it produces.  Admin. Reply Br. of Unicatch (Sept. 27, 2017) at 37, CR 97,

PR 180, CJA Vol. IV, Tab 61.  Unicatch explained further that the costs reported in

Exhibit SSD-2 differed from the costs in the cost database by an amount consisting of

the cost of four product types that it sold, but did not produce, during the period of

review.  *Id.* at 38.

For the *Final Results*, Commerce disregarded Unicatch's submitted data and

determined a dumping margin based on total AFA.  I&D Mem. at 16–19.  Commerce

concluded that Unicatch failed to reconcile the difference between the cost of sales

reflected in its financial statements and the extended total cost of manufacturing

reported in the cost database.  *Id.* at 16.  At most, according to Commerce, Unicatch

indicated how Commerce might complete the reconciliation using a schedule containing

non-subject merchandise.  *Id.* at 19.  Commerce rejected Mid Continent's "gap-filling

alternative adjustment" because "it only leads to more questions regarding the

completeness of the reconciliation, the reconciling items, and whether all costs were

properly included or excluded. *Id.* at 18. Commerce explained that its practice is to

reject all of a respondent's submitted information "when flawed and unreliable cost data

renders any price-to-price comparison impossible." *Id.* at 18 & n.65 (quoting Issues and

Decision Mem. for the Final Determination of the Investigation of Prestressed Concrete

Steel Wire Strand from Mexico, A-201-831 (Dec. 8, 2003) ("Wire Strand from Mexico

Mem.") at 13, *available at* https://enforcement.trade.gov/frn/summary/mexico/03-30384-

1.pdf (last visited Dec. 19, 2019)).

Commerce further found that Unicatch's "fail[ure] to submit a complete cost

reconciliation" reflected less than full cooperation and merited use of an adverse

inference. *Id.* at 20; *see also id.* ("Unicatch had multiple chances to answer

Commerce's questionnaires and simply did not answer the questions asked. It further

instructed Commerce how to get the completed reconciliation without actually providing

it."). Commerce assigned Unicatch the dumping margin alleged in the petition

underlying the original investigation based on its practice, which "is to select, as an AFA

rate, the higher of: (1) the highest dumping margin alleged in the petition, or (2) the

highest calculated rate of any respondent in the investigation." *Id.* at 21–22 & n.80

(citation omitted).

### B. Substantial Evidence Supports Commerce's Use of Total Facts Otherwise Available; However, Commerce's Use of an Adverse Inference Must be Remanded

TC/Unicatch asserts that Commerce's use of the facts otherwise available with an adverse inference lacks substantial evidence; Commerce failed to comply with 19 U.S.C. § 1677m(d) and (e) before turning to the facts available; Commerce erred in disregarding all of Unicatch's submitted data—both sales and costs—to instead rely on total AFA; and the agency failed to comply with the statutory requirement to evaluate whether Unicatch's conduct merited selection of the highest rate.  TC/Unicatch's Mem. at 20–44; TC/Unicatch's Reply at 6–23.  PrimeSource and S.T.O. Industries adopt by incorporation Unicatch's arguments.  PrimeSource's Mem. at 17; S.T.O.'s Mot. at 1.

The court sustains Commerce's decision to use total facts otherwise available to determine Unicatch's margin; however, Commerce's use of an adverse inference lacks substantial evidence.  For that reason, the court declines to reach TC/Unicatch's arguments regarding Commerce's selection of an adverse rate.

### 1. Commerce's Use of the Facts Otherwise Available

On three occasions, Commerce instructed Unicatch to submit a complete cost reconciliation that began with the cost of sales reflected in the company's financial statements and ended with the reported per-unit costs submitted to the agency.  Initial QRE at D-12 to D-13; Unicatch's 1st Suppl. QRE at 9; Unicatch's 2nd Suppl. QRE at 6. TC/Unicatch does not dispute Commerce's core finding that Unicatch failed to complete the requested cost reconciliation.  *See* I&D Mem. at 16, 19; TC/Unicatch's Mem. at 20 (stating that "all of the information necessary *to* reconcile" the financial statements down

to the reported costs was on the record) (emphasis added); *id.* at 25 (recognizing the need to reconcile the difference between the figures specific to subject merchandise and the reported figures for subject and non-subject merchandise); TC/Unicatch's Reply at 17 (noting the missing "numerical summary of Unicatch's [narrative] explanation of the differences").

TC/Unicatch's argument that Commerce failed to afford Unicatch an opportunity to remedy its deficient cost reconciliation is unpersuasive.  TC/Unicatch's Mem. at 28–34; TC/Unicatch's Reply at 9, 15–16.  TC/Unicatch advocates for leniency on the basis that Commerce now provides—but did not then provide—a template for completing a cost reconciliation.  TC/Unicatch's Mem. at 33.[13]  However, Commerce's first supplemental questionnaire explicitly instructed Unicatch to reconcile its cost of sales from the financial statements down "to the extended TOTCOM in the submitted cost database" and identified the (proprietary) ending value.  Unicatch's 1st Suppl. QRE at 9.  Commerce repeated its request for a complete cost reconciliation in the second supplemental questionnaire.  Unicatch's 2nd Suppl. QRE at 6.  At no time did TC/Unicatch express a lack of understanding of the request or seek further guidance from Commerce on how to respond to the request.

TC/Unicatch objects further that Commerce failed to identify the reconciling items for which it needed explanations and, thus, it reasonably believed that it did not need to

---

[13] TC/Unicatch appended a copy of the template to its moving brief.  *See* TC/Unicatch's Mem., Ex. 1 at D-13.  The template is not, however, part of the administrative record before the court and will be afforded no further consideration.  19 U.S.C. § 1516a(b)(1)(B)(i).

explain certain offsets to product-specific costs for internal consumption of non-subject

merchandise.  TC/Unicatch's Reply at 8–9.  However, Commerce expressly requested

explanations for "all [] reconciling items."  Initial QRE at D-13; *see also* Unicatch's 2nd

Suppl. QRE at 6 (requesting explanations and "documentary support for each

reconciling item").  The line items reflecting costs for internal consumption of non-

subject merchandise are necessary to reconcile Unicatch's total cost of production to its

product-specific costs.  *See* Unicatch's 2nd Suppl. QR at Ex. SSD-3.  Thus, substantial

record evidence supports Commerce's conclusion that it lacked explanations for each

reconciling item.  I&D Mem. at 17 & n.61; Final Results Analysis of the 2015–2016

Antidumping Duty Admin. Review of Certain Steel Nails from Taiwan: Unicatch Indus.

Co. Ltd. (Unicatch) (Feb. 6, 2018) ("Unicatch's Final Analysis Mem.") at 2, CR 98–99,

CJA Vol. IV, Tab 67.  In sum, Unicatch had three opportunities to submit a complete

cost reconciliation; Commerce was not required to provide a fourth opportunity.  *See,

e.g.*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)

(finding that Commerce complied with 19 U.S.C. § 1677m(d) when it issued a

supplemental questionnaire informing respondent of the defective submission).[14]

---

[14] TC/Unicatch's reliance on *Hyundai Heavy Industries, Co. v. United States*, 42 CIT ___, ___, 332 F. Supp. 3d 1331, 1347–48 (2018), and *Borusan Mannesmann Boru Sanayi v. Ticaret A.S. v. United States*, 39 CIT ___, ___, 61 F. Supp. 3d 1306, 1348–49 (2015), for the proposition that Commerce's supplemental questionnaires failed to adequately apprise Unicatch of the deficiencies lacks merit.  *See* TC/Unicatch's Mem. at 30–33.  Not only were the supplemental questionnaires specific as to the requirements for completing the cost reconciliation, but the cited cases are inapposite.  *Hyundai Heavy* faulted Commerce for its finding that a respondent withheld information regarding accessories to subject merchandise "that was *specifically* requested" when the agency never defined the term "accessories" in response to the respondent's requests for a

TC/Unicatch's argument that Unicatch's cost reconciliation met the requirements for use pursuant to 19 U.S.C. § 1677m(e) also lacks merit.  TC/Unicatch's Mem. at 24–25.  Following Commerce's issuance of the *Preliminary Results* and in light of Mid Continent's expressed concerns, Commerce attempted to complete the reconciliation but found a discrepancy in the data.  Unicatch's Final Analysis Mem. at 1–2.  While TC/Unicatch asserts that Commerce simply misunderstood the submitted data and ignored Unicatch's explanation for the discrepancy, TC/Unicatch's Reply at 10, it was Unicatch's responsibility to build a clear record—not Commerce's, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  Commerce's finding that it lacked complete and reliable cost data that could be used without undue difficulties is supported by substantial evidence and, thus, Commerce was within its discretion to disregard Unicatch's cost information for the *Final Results*.  I&D Mem. at 18; *NTN Bearing*, 74 F.3d at 1208 ("[P]reliminary determinations are 'preliminary' precisely because they are subject to change."); *Hyundai Steel Co. v. United States*, 42 CIT ___, ___, 319 F. Supp. 3d 1327, 1343 (2018) ("Commerce has the flexibility to change its position from the preliminary to the final results, provided it explains the basis for the

---

clear definition.  332 F. Supp. 3d at 1345–48 (emphasis added).  In *Borusan*, the court remanded Commerce's use of AFA when the respondent informed Commerce that certain requested data was unnecessary to the determination and overly burdensome to collect and Commerce failed to address the respondent's concerns in its supplemental questionnaire.  61 F. Supp. 3d at 1344–46.  The court reasoned that Commerce's obligation to explain the "nature of the deficiency" included explaining why requested information is "necessary."  *Id.* at 1348.  Here, however, Unicatch never alerted Commerce to any lack of clarity regarding the appropriate ending value for its reconciliation and never averred that the requested reconciliation was unnecessary.  *See* I&D Mem. at 17.

change and its decision is supported by substantial evidence and in accordance with law.") (internal quotation marks and citation omitted).  Thus, substantial evidence supports Commerce's threshold finding that Unicatch's failure to submit a complete cost reconciliation triggered the agency's authority to use the facts otherwise available.

## 2.  Commerce's Use of *Total* Facts Otherwise Available

TC/Unicatch summarily argues that Commerce erred in rejecting all sales and cost data submitted by Unicatch based on imperfections in the cost reconciliation. TC/Unicatch's Mem. at 41.  However, judicial and agency precedent support Commerce's decision to use total facts available.  I&D Mem. at 18 & nn.64–66 (citing *Mukand, Ltd. v. United States*, Slip Op. 13-41, 2013 WL 1339399, at *8 (CIT Mar. 25, 2013); Issues and Decision Mem. for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Finished Carbon Steel Flanges from Italy, A-475-835 (June 23, 2017) ("Steel Flanges from Italy Mem.") at 10–16, *available at* https://enforcement.trade.gov/frn/summary/italy/2017-13629-1.pdf (last visited Dec. 19, 2019); Wire Strand from Mexico Mem. at 18–14); *see also Steel Auth. of India*, 25 CIT at 485–87, 149 F. Supp. 2d 921 at 926–928 (sustaining Commerce's use of total AFA when the respondent's submission of unreliable cost of production or constructed value information rendered impossible the price-to-price comparisons necessary to calculate an accurate dumping margin).

When, as here, "the U.S. price cannot be compared to home market prices, the [agency] compares the U.S. price to [constructed value]" to examine whether the subject merchandise is sold in the United States for less than fair value.  Wire Strand

from Mexico Mem. at 13.  However, "because most of the cost elements are the same

for [cost of production] and [constructed value]," the submission of unreliable cost

information impairs Commerce's ability to calculate constructed value and establish a

basis for comparison to U.S. price.  *Id*.; *see also* Steel Flanges from Italy Mem. at 13.  In

that situation, requiring Commerce to use partial, rather than total, facts available would

permit respondents "to manipulate the process by submitting only beneficial information"

and would place "ultimate control to determine what information would be used for the

margin calculation" in the hands of respondents rather than Commerce.  *Steel Auth. of*

*India*, 25 CIT at 487, 149 F. Supp. 2d at 928; *see also* Wire Strand from Mexico Mem. at

13.  Absent substantive arguments from TC/Unicatch as to why those concerns are not

warranted here, substantial evidence supports Commerce's resort to total facts

otherwise available.

### 3.  Commerce's Use of an Adverse Inference

Commerce based its decision to use an adverse inference on Unicatch's failure

to submit a complete cost reconciliation in response to Commerce's supplemental

questionnaires.  I&D Mem. at 20.  However, "[a]n adverse inference may not be drawn

merely from a failure to respond" to a request for information, "but only under

circumstances in which it is reasonable for Commerce to expect that more forthcoming

responses should have been made; i.e., under circumstances in which it is reasonable

to conclude that less than full cooperation has been shown."  *Nippon Steel*, 337 F.3d at

1383.  "A respondent can fail to respond because it was not able to obtain the

requested information, did not properly understand the question asked, or simply

overlooked a particular request," and such failure is not necessarily grounds for an adverse inference.  *Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 841– 42, 77 F. Supp. 2d 1302, 1316 (1999) (remanding AFA determination when Commerce never identified why a respondent's failure to respond to two aspects of the questionnaire "were anything more than inadvertent omissions" and the "respondent sought to correct its deficiencies in responding to a supplemental questionnaire"). Rather, to determine whether "less than full cooperation has been shown," Commerce should "examine [the] respondent's actions and assess the extent of [the] respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information."  *Nippon Steel*, 337 F.3d at 1382.  Such examination "make[s] it possible for a reviewing court to discern [Commerce's] reasons for finding that [the respondent], specifically, did not put forth its maximum effort before employing adverse inferences." *Nat'l Nail Corp*., 390 F. Supp. 3d at 1380.

Here, Commerce failed to account for evidence demonstrating Unicatch's attempts to comply with Commerce's supplemental questionnaire or apprise the court of its reasons for nevertheless finding less than full cooperation.  *See* I&D Mem. at 20; *Nippon Steel*, 337 F.3d at 1379 (directing the reviewing court to consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence'") (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  Rather, as with PT/Pro-Team, Commerce appears to have considered anything less than perfection as a failure to cooperate to the best of one's ability.  The statute, however, "does not require perfection and recognizes that

mistakes sometimes occur." *Nippon Steel*, 337 F.3d at 1382.  Commerce might have

bolstered its decision by complying with its stated practice of "consider[ing] . . . the

extent to which [Unicatch] may benefit from its own lack of cooperation," but Commerce

failed to do so.  *See* I&D Mem. at 20 & n.74 (citations omitted).  Thus, while the court

sustains Commerce's use of total *neutral* facts otherwise available to determine

Unicatch's margin, Commerce's decision to use an adverse inference lacks substantial

evidence and is remanded for reconsideration or further explanation.  Accordingly, the

court will defer resolution of TC/Unicatch's arguments regarding the adverse rate

Commerce selected pending Commerce's redetermination on remand.

IV.    **Commerce's Calculation of the All-Others Rate**

In the event the court remands Commerce's use of total AFA as to one or more

mandatory respondents, HL/Romp urge the court to order Commerce to recalculate the

rate assigned to non-examined respondents based on any company-specific rates

calculated in the remand proceeding.  HL/Romp's Mem. at 15–19; HL/Romp's Reply at

2–3.  The Government did not respond to this aspect of HL/Romp's moving brief;

however, at oral argument, the Government stated that Commerce's practice is to

recalculate the all-others rate when one or more mandatory respondents' rates change.

Oral Arg. at 02:02:07–02:02:29 (reflecting the time stamp from the recording).  In the

absence of a live dispute as to the correct method of calculating the all-others rate, the

court will not further address this issue.  *See Camreta v. Greene*, 563 U.S. 692, 717

(2011) (the "judicial [p]ower" is to be used "to render dispositive judgments, not advisory

opinions") (citation omitted).  Additionally, HL/Romp concede that their second claim

regarding Commerce's summary rejection of the ministerial error allegation "is moot" in the event the court remands Commerce's use of total AFA to determine PT/Pro-Team's and Unicatch's margin.  HL/Romp's Mem. at 23.  Because the court has remanded Commerce's use of total AFA with respect to both mandatory respondents, the court will not consider HL/Romp's claim at this time.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are sustained in part and remanded in part to the agency; and it is further

**ORDERED** that, on remand, Commerce shall, consistent with this opinion, reconsider or further explain its decision to use the facts otherwise available with respect to PT/Pro-Team and its decision to use an adverse inference when selecting from among the facts otherwise available with respect to Unicatch; and it is further

**ORDERED** that Commerce shall file its remand results on or before March 18, 2020; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

                                        /s/      Mark A. Barnett
                                        Mark A. Barnett, Judge

Dated: December 19, 2019
        New York, New York