Slip Op. 20-163

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRO-TEAM COIL NAIL ENTERPRISE, INC. AND PT ENTERPRISE INC., <br><br>Plaintiffs, <br><br>UNICATCH INDUSTRIAL CO., LTD., ET AL., <br><br>Consolidated Plaintiffs, <br><br>and <br><br>S.T.O. INDUSTRIES, INC., <br><br>Plaintiff-Intervenor, <br><br>v. <br><br>UNITED STATES, <br><br>Defendant, <br><br>and <br><br>MID CONTINENT STEEL & WIRE, INC., <br><br>Defendant-Intervenor. | Before: Mark A. Barnett, Judge <br> Consol. Court No. 18-00027 |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's remand results issued in connection with the first administrative review of the antidumping duty order on certain steel nails from Taiwan.]

Dated: November 16, 2020

Ned H. Marshak, Max F. Shutzman, Andrew T. Schutz, Dharmendra Choudhary, and Eve Q. Wang, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Plaintiffs Pro-Team Coil Enterprise, Inc. and PT Enterprise Inc.; Consolidated

Plaintiffs Unicatch Industrial Co., Ltd. and TC International, Inc.; and Consolidated Plaintiffs Hor Liang Industrial Corp. and Romp Coil Nails Industries Inc.

<u>Ronald M. Wisla</u>, Fox Rothschild LLP, of Washington, DC, for Plaintiff-Intervenor S.T.O. Industries, Inc.

<u>Sosun Bae</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were <u>Ethan P. Davis</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Vania Wang</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Adam H. Gordon</u> and <u>Ping Gong</u>, The Bristol Group LLC, of Washington, DC, for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

Barnett, Judge:  In this consolidated action, five sets of plaintiffs[1] each challenged aspects of the final results of the U.S. Department of Commerce's ("Commerce" or "the agency") first administrative review of the antidumping duty order on certain steel nails from Taiwan.  *See Certain Steel Nails From Taiwan*, 83 Fed. Reg. 6,163 (Dep't Commerce Feb. 13, 2018) (final results of antidumping duty admin. review and partial rescission of admin. review; 2015–2016) ("*Final Results*"), ECF No. 20-2, and accompanying Issues and Decision Mem, A-583-854 (Feb. 6, 2018) ("I&D Mem."), ECF No. 20-3.  The matter is before the court following Commerce's first redetermination upon remand, *see* Final Results of Redetermination Pursuant to Court

---

[1] The five sets of plaintiffs consist of lead Plaintiffs Pro-Team Coil Nail Enterprise, Inc. and PT Enterprise Inc. (together, "Pro-Team"); Consolidated Plaintiffs Unicatch Industrial Co., Ltd. and TC International, Inc. (together, "Unicatch"); Consolidated Plaintiff PrimeSource Building Products, Inc. ("PrimeSource"); Consolidated Plaintiffs Hor Liang Industrial Corp. and Romp Coil Nails Industries (together, "Hor Liang"); and Plaintiff-Intervenor S.T.O. Industries, Inc. ("S.T.O. Industries").

Consol. Court No. 18-00027 Page 3

Remand ("Remand Results"), ECF No. 71-1,[2] issued in response to the court's resolution of five motions for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2, *see Pro-Team Coil Nail Enter. v. United States*, 43 CIT \_\_\_, 419 F. Supp. 3d 1319 (2019).  The court remanded Commerce's use of total facts otherwise available with respect to Pro-Team, *id.* at 1330–34; sustained Commerce's use of total neutral facts otherwise available with respect to Unicatch but remanded Commerce's use of an adverse inference when selecting from among the facts otherwise available (referred to as "adverse facts available" or "AFA"), *id.* at 1336–40; declined to reach Hor Liang's first claim seeking a recalculation of the rate assigned to non-examined respondents on remand given the absence of a live dispute, *id.* at 1340; and declined to resolve Hor Liang's second claim regarding Commerce's summary denial of their ministerial error allegation on mootness grounds, *id.*

On remand, Commerce reconsidered its use of total facts otherwise available with respect to Pro-Team and, instead, used Pro-Team's reported data and calculated a company-specific dumping margin of zero percent.  Remand Results at 6–8, 32.  With respect to Unicatch, Commerce provided additional explanation supporting its use of total AFA to determine Unicatch's dumping margin and continued to select the 78.17 percent dumping margin alleged in the petition as the AFA rate.  *Id.* at 8–15, 20–28, 32.

---

[2] The administrative record associated with the Remand Results is divided into a Public Remand Record ("PRR"), ECF No. 72-2, and a Confidential Remand Record ("CRR"), ECF No. 72-3.  Parties submitted joint appendices containing record documents cited in their comments on the Remand Results.  *See* Public Remand J.A., ECF No. 94; Confidential Remand J.A. ("CRJA"), ECF No. 93.  The court references the confidential version of the relevant record documents, unless otherwise specified.

Consol. Court No. 18-00027                                                                                          Page 4

For the all-others rate applicable to the non-examined respondents, such as Hor Liang, Commerce calculated the simple average of Pro-Team's zero percent margin and Unicatch's 78.17 percent margin to assign these respondents a rate of 39.09 percent. *Id.* at 15–16, 28–32.

Unicatch submitted comments opposing Commerce's use of total AFA and its selection of the petition rate.  Confidential Consol. Pls., [Unicatch] Cmts. on Redetermination ("Unicatch's Opp'n Cmts"), ECF No. 84.[3]  Hor Liang submitted comments opposing Commerce's method of calculating the all-others rate.  Confidential Consol. Pls., [Hor Liang] Cmts. on Redetermination ("Hor Liang's Opp'n Cmts."), ECF No. 77.

Pro-Team submitted comments supporting the Remand Results with respect to its zero percent rate.  [Pro-Team's] Cmts. Sup[p]orting Remand, ECF No. 86.  Defendant United States ("the Government") and Defendant-Intervenor Mid Continent Steel & Wire, Inc. ("Mid Continent") urge the court to sustain the Remand Results in their entirety.  Def.'s Resp. to the Parties' Cmts. Upon [Commerce's] Remand Redetermination ("Gov't's Reply Cmts."), ECF No. 87; Def.-Int. [Mid Continent's] Cmts. in Supp. of Final Remand Results, ECF No. 88.

---

[3] S.T.O. Industries filed comments agreeing with and incorporating by reference Unicatch's comments.   Pl.-Int.'s Cmts. in Opp'n to Remand Results, ECF No. 79. PrimeSource did not file comments on the Remand Results.

For the following reasons, the court sustains Commerce's redetermination with respect to Pro-Team[4] and use of AFA with respect to Unicatch.  However, the court remands Commerce's selection of the petition rate as AFA because Commerce did not adequately corroborate that rate.  Accordingly, the court defers resolution of Hor Liang's arguments regarding the all-others rate.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1259 (2014)).

---

[4] In the absence of any challenge to Commerce's redetermination respecting Pro-Team, the court will not further discuss that aspect of the Remand Results.
[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless stated otherwise.

# DISCUSSION

## I. Commerce's Use of Total AFA for Unicatch and Selection of Unicatch's AFA Rate

### A. Relevant Background

The court presumes familiarity with the facts and procedural history set forth in *Pro-Team* and summarizes below the relevant facts.

In the underlying administrative review, Commerce selected Unicatch as a mandatory respondent. Remand Results at 4. Commerce issued Unicatch a section D questionnaire that contained detailed instructions for preparing a complete cost reconciliation. *Pro-Team*, 419 F. Supp. 3d at 1334; *see also* Remand Results at 4. Upon examining Unicatch's section D cost response, Commerce issued a supplemental questionnaire instructing Unicatch to "revise its cost reconciliation to reconcile the sales from Unicatch's audited financial statements to the extended total cost of manufacturing in Unicatch's submitted cost database." Remand Results at 4. In response, Unicatch explained "that its initial worksheet reconciled the cost of sales to Unicatch's cost of production for both subject and non-subject merchandise." *Id.* at 4–5 & n.20 (citation omitted). Commerce issued a second supplemental questionnaire repeating its request for a revised cost reconciliation and further requesting explanations and documentary support for each reconciling item. *Id.* at 5 & n.21 (citation omitted). Unicatch submitted a revised cost reconciliation "that ended with the cost of production for subject and non-subject merchandise." *Id.* at 5 & n.22 (citation omitted). In its administrative rebuttal

Consol. Court No. 18-00027                                                                                    Page 7

brief, Unicatch explained how Commerce could use record information to complete the reconciliation.  *Pro-Team*, 419 F. Supp. 3d at 1335.

"For the *Final Results*, Commerce disregarded Unicatch's submitted data and determined a dumping margin based on total AFA."  *Id.* at 1335–36.  *Pro-Team* remanded that determination.  *Id.* at 1340.  The court explained that "Commerce based its decision to use an adverse inference on Unicatch's failure to submit a complete cost reconciliation" but otherwise failed to either address "evidence demonstrating Unicatch's attempts to comply with Commerce's supplemental questionnaire[s] or apprise the court of its reasons for nevertheless finding less than full cooperation."  *Id.* at 1339.

In the redetermination, Commerce continued to find that Unicatch failed to "cooperate to the best of its ability and that it potentially benefitted from its lack of cooperation."  Remand Results at 8.  Commerce stated that the agency issued "multiple requests" that "contain[ed] clear instructions on what information was necessary."  *Id.* at 11; *see also id.* at 24–25.  Commerce explained that it reasonably "expect[ed] more forthcoming responses" from Unicatch, *id.* at 11, but Unicatch "simply did not put forth the effort or cooperation to respond fully to Commerce's requests for a complete cost reconciliation," *id.* at 12.  Further supporting its determination, Commerce explained, was Unicatch's provision of instructions for completing the reconciliation, which demonstrated that Unicatch "understood how to provide the requested information" but "chose not to do so."  *Id.*  Even then, Commerce found, Unicatch's instructions "failed to directly link to the antidumping cost database" and Commerce confronted "significant discrepancies" when it attempted to complete the reconciliation.  *Id.*  Commerce further

found that Unicatch's failure to provide a cost reconciliation "would benefit Unicatch" because it precluded Commerce from conducting a below cost sales analysis or asking follow-up questions, thus inhibiting the agency's ability to make a proper determination whether dumping has occurred. *Id.* at 14. Commerce also found that Unicatch's failure to provide the complete reconciliation allowed Unicatch to "control[] the pace and schedule for Commerce's work." *Id.* at 22.

With respect to the AFA rate assigned to Unicatch, Commerce explained that its "practice is to select, as an AFA rate, the higher of: (1) the highest dumping margin alleged in the petition, or (2) the highest calculated rate from any previous segment of a proceeding under an [antidumping] order." *Id.* at 15 & n.60 (citations omitted); *see also id.* at 27. Commerce further explained that it "select[ed] the highest dumping margin alleged in the petition, 78.17 percent," in light of "Unicatch's multiple failures to supply a complete reconciliation and to ensure that Unicatch does not obtain a more favorable result by failing to cooperate than if it had fully cooperated." *Id.* at 15. Commerce rejected the highest calculated rate from the investigation as insufficient to induce cooperation.[6] *Id.* Commerce referred to its explanation in the Issues and Decision

---

[6] In the investigation, Commerce calculated rates for the two mandatory respondents in the amount of zero percent and 2.24 percent, respectively. *Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28,959, 28,961 (Dep't Commerce May 20, 2015) (final determination of sales at less than fair value). Following litigation before the CIT, Commerce revised the 2.24 percent rate to 2.16 percent. *Certain Steel Nails From Taiwan*, 82 Fed. Reg. 55,090, 55,091 (Dep't Commerce Nov. 20, 2017) (notice of court decision not in harmony with final determination in less than fair value investigation and notice of am. final determination); *Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT ___, 273 F. Supp. 3d 1161 (2017). That rate is nonfinal because the U.S. Court of

Memorandum regarding the agency's corroboration of the AFA rate. *Id.* According to Commerce, that explanation demonstrated that the AFA rate "(1) was determined to be reliable in the pre-initiation stage of the investigation; and (2) is relevant based on information derived from the petition that gave rise to the investigation." *Id.* at 15 & n.62 (citing I&D Mem. at Cmt. 2).

### B. Commerce's Use of an Adverse Inference is Supported by Substantial Evidence and Reasoned Explanation

At issue here is whether Commerce's use of an adverse inference is supported by substantial evidence and reasoned explanation. *See* Unicatch's Opp'n Cmts. at 4–13; Gov't's Reply Cmts. at 8–11; *Pro-Team*, 419 F. Supp. 3d at 1336–39 (sustaining Commerce's use of total facts otherwise available). Commerce may use an inference that is adverse to the interests of a respondent when Commerce determines that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). As discussed, Commerce determined that Unicatch's conduct in this case did not satisfy the "best of its ability" standard because Unicatch failed to submit a complete

---

Appeals for the Federal Circuit ("Federal Circuit") concluded that Commerce must reconsider one aspect of its calculation of that rate. *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673–75 (Fed. Cir. 2019). Commerce's redetermination is pending before the CIT. *See Mid Continent Steel & Wire, Inc., et al. v. United States, et al.*, Court No. 15-cv-00213 (CIT June 16, 2020).

Consol. Court No. 18-00027 Page 10

cost reconciliation despite "multiple requests" that "contain[ed] clear instructions on what information was necessary." Remand Results at 11. While Unicatch argues that Commerce's use of an adverse inference is unsupported by substantial evidence, Unicatch's Opp'n Cmts. at 1–13, those arguments lack merit.

Unicatch argues that it mistakenly believed that its cost reconciliation was complete and that its mistake does not merit an adverse inference. *Id.* at 4–13. Here, however, on three occasions Commerce instructed Unicatch to end its reconciliation with its total submitted cost of manufacturing, and in each corresponding response Unicatch failed to do so. Remand Results at 11–15. While the statute "does not require perfection and recognizes that mistakes *sometimes* occur, it does not condone inattentiveness [or] carelessness." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). After three detailed requests for a complete cost reconciliation, Commerce reasonably expected "more forthcoming responses" from Unicatch. Remand Results at 11.[7]

Unicatch further argues that Commerce overreached in using an adverse inference because Unicatch "sought to correct its deficiencies in responding to a

---

[7] Commerce characterizes Unicatch's conduct as intentional, stating, for example, that "Unicatch repeatedly refused to provide Commerce with a complete cost reconciliation." Remand Results at 13; *see also, e.g.*, *id.* at 24. While the record supports Commerce's finding that Unicatch failed to cooperate *fully* with Commerce's request for a complete cost reconciliation, Commerce did not identify substantial evidence demonstrating that Unicatch deliberately withheld information. *Cf., e.g., id.* at 12 (stating that Unicatch "simply did not put forth the effort or cooperation to respond fully"). That discrepancy does not change the outcome, however, because it is well-settled that "[t]he statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at 1383.

supplemental questionnaire," Unicatch's Opp'n Cmts. at 6 & n.6 (quoting *Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 842, 77 F. Supp. 2d 1302, 1316 (1999)), and any noncompliance was not "willful or deliberate," *id.* at 6 & n.7 (quoting *Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1177, 178 F. Supp. 2d 1305, 1334 (2001)); *see also id.* at 12. Unicatch's reliance on *Mannesmannrohren-Werke AG* and *Fujian Machinary* is misplaced. In each case, the court sustained Commerce's use of adverse facts available in the subsequent redetermination that further explained why an adverse inference was merited in connection with conduct not unlike the facts of this case. *See Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 27 CIT 1059, 1067–68, 276 F. Supp. 2d 1371, 1378–79 (2003) (sustaining Commerce's use of AFA based on record evidence of "multiple failures" to provide requested information the respondent was able to provide); *Mannesmannrohren-Werke AG v. United States*, 24 CIT 1082, 1090–91, 120 F. Supp. 2d 1075, 1081–83 (2000) (sustaining Commerce's use of AFA when the respondent simply repeated deficient information following Commerce's requests for clarification in two supplemental questionnaires).

Unicatch also argues that "Commerce should have clarified . . . the precise format for the information required" or again requested the complete cost reconciliation "in its Third Supplemental Questionnaire." Unicatch's Opp'n Cmts. at 7 (citing *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) (a case in which Commerce issued four supplemental questionnaires and provided a sample chart for the respondent to complete before applying AFA)). The Federal Circuit's decision in

*Mukand* to sustain Commerce's use of AFA did not, however, rest on the number of questionnaires Commerce issued or Commerce's provision of a sample chart. Rather, the appellate court explained that the respondent's evasiveness and sudden production of requested information following Commerce's use of AFA in its preliminary determination justified Commerce's use of an adverse inference in the final determination. *Mukand*, 767 F.3d at 1307.

While *Mukand* is factually distinct, the appellate court noted that Commerce reasonably expected "more accurate and responsive answers to the questionnaire[s]" that sought information that is "fundamental" to "the dumping analysis." *Id.* So too here, reliable and complete cost information is necessary for Commerce to "calculate constructed value[,] . . establish a basis for comparison to U.S. price," and, ultimately, calculate an accurate dumping margin. *Pro-Team*, 419 F. Supp. 3d at 1339. Thus, Commerce was within its discretion to use an adverse inference in order to incentivize Unicatch to cooperate more fully in providing this information in future reviews. *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (explaining that, in the absence of subpoena power, "the adverse facts statute . . . provide[s] respondents with an incentive to cooperate with Commerce's [administrative review]") (alteration and citations omitted). Accordingly, Commerce's use of an adverse inference is sustained.

### C. Commerce's Selection of the 78.17 Percent AFA Rate Must Be Reconsidered

When using an adverse inference to select from among the facts otherwise available, Commerce may rely "on information derived from--(A) the petition, (B) a final determination in the investigation . . . , (C) any previous [administrative] review . . . , or (D) any other information placed on the record." 19 U.S.C. § 1677e(b)(2). If Commerce "relies on secondary information"—that is, information that was not "obtained in the course of an investigation or review"—Commerce must, "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." *Id.* § 1677e(c)(1). Corroboration does not require Commerce "to estimate what the . . . dumping margin would have been if [Unicatch] had cooperated" or "demonstrate that the . . . dumping margin used by the [agency] reflects an alleged commercial reality of [Unicatch]." *Id.* § 1677e(d)(3). Additionally, Commerce "is not required to determine, or make any adjustments to, a . . . weighted average dumping margin based on any assumptions about information the interested party would have provided if [Unicatch] had complied with the request for information." *Id.* § 1677e(b)(1)(B).

Unicatch argues that the data underlying the petition rate "had no relationship with actual prices and costs of Taiwan nails sold to the United States" in any segment of this proceeding and the petition rate is aberrant in light of the rate Commerce calculated for Pro-Team during the remand proceeding. Unicatch's Opp'n Cmts. at 15–16. The court understands Unicatch to argue that the petition rate was insufficiently

corroborated.  The Government argues that Commerce's selection of the petition rate is lawful and supported by substantial evidence.  Gov't's Reply Cmts. at 12–14.

"Corroborat[ion] means that the [agency] will examine whether the secondary information to be used has probative value."  19 C.F.R. § 351.308(d).  Commerce evaluates the information's probative value by "examin[ing] the reliability and relevance of the information to be used."  I&D Mem. at 21 & n.83 (citation omitted).

Commerce supported its determination that the petition rate "is reliable for purposes of this review" by way of reference to the agency's pre-initiation examination of the information provided in the petition and corresponding discussion in the notice regarding Commerce's initiation of the investigation.  *Id.* at 21–22 & nn.86–87 (citing *Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019, 36,019–23 (Dep't Commerce June 25, 2014) (initiation of less-than-fair-value investigations).  Commerce further determined that the petition rate is relevant, explaining:

> The petitioner calculated normal value for the petition based on the experience of a surrogate producer of nails, adjusted for known differences between the surrogate producer and the industry of Taiwan, during the proposed [period of investigation].  The petitioner relied on financial statements of a producer of comparable merchandise operating in Taiwan to determine depreciation, [selling, general and administrative expenses], financial expenses, and profit rates.  In calculating export price, the petitioner based U.S. price on a resale price from a distributor/trading company to its downstream customer in the U.S. during the period of investigation . . . .  Based on the price quote by an unaffiliated distributor, the petitioner deducted from these prices movement expenses consistent with the sales delivery terms and adjusted for mark-ups from the distributors/trading companies.  Based on this

Consol. Court No. 18-00027                                                                                              Page 15

>    information, we determine that the dumping margin alleged in the Petition
>    is relevant.

*Id.* at 22 (internal footnote citations omitted).

The court cannot conclude that Commerce adequately corroborated the petition rate. Corroboration requires a petition rate to meet a different standard than is necessary at the pre-initiation stage of an investigation. *Compare* 19 U.S.C. § 1677e(c) *and* 19 C.F.R. § 351.308(d) (discussed above), *with* 19 U.S.C. § 1673a(c)(1)(A)(i) (directing Commerce, upon receipt of a petition and before initiating an investigation, to use readily available sources to examine "the accuracy and adequacy of the evidence provided in the petition" and "determine whether the petition alleges the elements necessary for the imposition of a duty under [19 U.S.C. §] 1673 . . . and contains information reasonably available to the petitioner supporting the allegations").[8] Commerce has recognized this different standard in other administrative determinations. *See, e.g.*, Issues and Decision Mem. for the Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Lined Paper Prods. from Indonesia, A-560-818 (Aug. 16, 2006), *available at* https://enforcement.trade.gov/frn/summary/indonesia/E6-13470-1.pdf (last visited Nov. 16, 2020) (finding that Commerce's corroboration of a petition rate in an investigation met "the higher standard applicable to preliminary and final

---

[8] Commerce's regulations also direct petitioners in an antidumping proceeding to include in the petition "factual information" for Commerce to calculate export price, constructed export price, and normal value. 19 C.F.R. § 351.202(b)(7)(B); *see also* 19 C.F.R. § 351.203(b)(1) (stating agency requirements for determining sufficiency of the petition).

determinations" as compared to pre-initiation). Thus, "Commerce's determination that the . . . petition rate[ was] sufficient to warrant initiation of an investigation is not the same as finding [that rate] reliable for determining a rate after the investigation has been concluded." *Yantai Xinke Steel Structure Co. v. United States*, 36 CIT 1035, 1042 (2012).[9]

"[T]he petition constitutes . . . 'an allegation of dumping, not a determination of dumping.'" *Id.* (quoting *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 35 CIT 1161, 1173 (2011)). Consistent with that observation, the statute exempts Commerce from the corroboration requirement when it selects as an AFA rate "any dumping margin" used "in a separate segment of the same proceeding." 19 U.S.C. § 1677e(c)(2). Commerce did not, however, use this petition rate in the original investigation, *see supra* note 6; thus, the rate remains an "unverified allegation[]" that is subject to the corroboration requirement before Commerce may utilize it. Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,

---

[9] While *Yantai Xinke* addressed—and rejected—Commerce's use of a simple average of the petition rates to calculate the rate assigned to separate rate respondents pursuant to 19 U.S.C. § 1673d(c)(5)(B) and, thus, did not address 19 U.S.C. § 1677e(c)(1), 36 CIT at 1039–43, the court's opinion is nevertheless instructive for its insight into the limitations of Commerce's pre-initiation evaluation of a petition rate when the agency seeks to rely on that rate later in the proceeding.

4199 ("Secondary information may not be entirely reliable because, for example, as in the case of the petition, it is based on unverified allegation.").[10]

      Here, Commerce has overlooked information reasonably at its disposal that could inform the reliability and relevance of the petition rate—such as data underlying the rates Commerce calculated for mandatory respondents in the investigation or the instant review. *See* 19 U.S.C. § 1677e(c)(1) (instructing Commerce to corroborate secondary "information from independent sources that are reasonably at [its] disposal"). Thus, Commerce's determination that the petition rate is reliable and relevant for purposes of this administrative review, based on nothing more than its pre-initiation review of the data, is unsupported by substantial evidence and reasoned explanation. Accordingly, Commerce must reconsider or further explain its corroboration of the petition rate.

      Unicatch also argues that Commerce failed to conduct the analysis discussed in *BMW of North America LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) to ensure that the AFA rate was not punitive. Unicatch's Opp'n Cmts. at 13–15. Here, as previously noted, Commerce followed its practice of selecting the higher of the highest dumping margin alleged in the petition or the highest rate from any prior segment of the proceeding, i.e., the investigation. Remand Results at 14. Commerce largely ignored Unicatch's arguments that the 78.17 percent rate was punitive, aberrational, and lacking

---

[10] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act." 19 U.S.C. §3512(d).

consideration of the totality of the circumstances or the seriousness of Unicatch's conduct.  Cmts. in Resp. to Draft Results of Redetermination Pursuant to Court Remand (Feb. 26, 2020) at 15–21, CRR 5, PRR 10, CRJA Tab 31 (discussing, inter alia, BMW, 926 F.3d at 1301).  At most, Commerce pointed to Unicatch's "multiple failures to supply a complete reconciliation" to support the selection of the petition rate over the highest calculated investigation rate, Remand Results at 15, which is the same rationale Commerce supplied for its use of AFA, see id. at 11.

　　　Because the court is remanding Commerce's selection of the petition rate as AFA, the court defers further consideration of Unicatch's arguments that the selected petition rate was unduly punitive.  On remand, Commerce may only continue to rely on the petition rate if the agency identifies substantial evidence supporting its corroboration of the rate and the agency's use of that rate is otherwise lawful.  Alternatively, Commerce may choose another source of adverse facts available, in which case it must corroborate that information if so required, see 19 U.S.C. § 1677e(c), and, as necessary, adhere to the requirements set forth in 19 U.S.C. § 1677e(d)(2).[11]

---

[11] Unicatch relies on the court's discussion of section 1677e(d)(2) in POSCO v. United States, 42 CIT ___, ___, 296 F. Supp. 3d 1320, 1349 (2018), to support its argument that Commerce must conduct further analysis of the petition rate.  See Unicatch's Opp'n Cmts. at 14.  In POSCO, the court explained that subsection (d)(2) directs Commerce to base its selection of the dumping margin, which may include the highest margin specified under subsection (d)(1), on an "evaluation . . . of the situation that resulted in [the agency] using an adverse inference."  296 F. Supp. 3d at 1349 (quoting 19 U.S.C. § 1677e(d)(2)) (alterations original).  Subsection (d)(2), however, applies when Commerce is "carrying out paragraph (1)," i.e., subsection (d)(1).  19 U.S.C. § 1677e(d)(2).  Subsection (d)(1) contemplates Commerce's use, as AFA, of "any dumping margin from any segment of the proceeding under the applicable antidumping

II. **Commerce's Calculation of the Rate Assigned to Non-Examined Companies**

Hor Liang argues, *inter alia*, that the 39.09 percent all-others rate derived from the simple average of Pro-Team's zero percent rate and Unicatch's 78.17 percent rate is not reasonably reflective of Hor Liang's dumping margin and is aberrational and punitive. Hor Liang's Opp'n Cmts. at 8–9. Because the court is remanding Commerce's selection of the 78.17 percent rate for Unicatch, the court will defer resolution of Hor Liang's arguments pending Commerce's second remand redetermination.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are sustained with respect to Commerce's calculation of a weighted-average dumping margin of zero percent for Pro-Team; it is further

**ORDERED** that Commerce's Remand Results are sustained with respect to Commerce's use of an adverse inference with respect to Unicatch; it is further

**ORDERED** that Commerce's Remand Results are remanded with respect to Commerce's selection of Unicatch's AFA rate in accordance with this opinion; it is further

---

order." *Id.* § 1677e(d)(1)(B). Here, Commerce instead relied on the rate alleged in the petition and section 1677e(d)(2) is inapplicable at this time.

Consol. Court No. 18-00027 Page 20

**ORDERED** that the court defers resolution of all challenges to the all-others rate pending Commerce's second redetermination; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before February 16, 2021; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 4,000 words.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: November 16, 2020
       New York, New York