Slip Op. 21-93

## UNITED STATES COURT OF INTERNATIONAL TRADE

PRO-TEAM COIL NAIL ENTERPRISE,
INC. AND PT ENTERPRISE INC.,

              Plaintiffs,

UNICATCH INDUSTRIAL CO., LTD., ET
AL.,

              Consolidated Plaintiffs,

    and

S.T.O. INDUSTRIES, INC.,

              Plaintiff-Intervenor,

      v.

UNITED STATES,

              Defendant,

    and

MID CONTINENT STEEL & WIRE, INC.,

              Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 18-00027

**PUBLIC VERSION**

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's second remand results for the first administrative review of the antidumping duty order on certain steel nails from Taiwan.]

Dated: July 30, 2021

Ned H. Marshak, Max F. Shutzman, and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Plaintiffs Pro-Team Coil Enterprise, Inc. and PT Enterprise Inc.; Consolidated Plaintiffs Unicatch Industrial Co.,

Ltd. and TC International, Inc.; and Consolidated Plaintiffs Hor Liang Industrial Corp. and Romp Coil Nails Industries Inc.

Ronald M. Wisla, Fox Rothschild LLP, of Washington, DC, for Plaintiff-Intervenor S.T.O. Industries, Inc.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Jared Cynamon, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon and Ping Gong, The Bristol Group PLLC, of Washington, DC, for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

Barnett, Chief Judge:  This action is before the court on the U.S. Department of Commerce's ("Commerce" or "the agency") second remand results in the first administrative review of the antidumping duty order on certain steel nails from Taiwan. *See* Confidential Final Results of [Second] Redetermination Pursuant to Court Remand ("Second Remand Results"), ECF No. 99-1; *see generally Certain Steel Nails From Taiwan*, 83 Fed. Reg. 6,163 (Dep't Commerce Feb. 13, 2018) (final results of antidumping duty admin. review and partial rescission of admin. review; 2015–2016) ("*Final Results*"), ECF No. 20-2, and accompanying Issues and Decision Mem, A-583-854 (Feb. 6, 2018) ("I&D Mem."), ECF No. 20-3.[1]  The court has issued two opinions

---

[1] The administrative record associated with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 20-4, and a Confidential Administrative Record ("CR"), ECF No. 20-5. The administrative record associated with the Second Remand Results is divided into a Public Remand Record ("2RPR"), ECF No. 101-2, and a Confidential Remand Record ("2RCR"), ECF No. 101-3.  Parties submitted joint appendices containing record documents cited in their comments on the Second

resolving substantive issues in this case; familiarity with those opinions is presumed. *See Pro-Team Coil Nail Enter. v. United States* ("*Pro-Team II*"), 44 CIT ___, 483 F. Supp. 3d 1242 (2020); *Pro-Team Coil Nail Enter. v. United States* ("*Pro-Team I*"), 43 CIT ___, 419 F. Supp. 3d 1319 (2019).

For the *Final Results*, Commerce determined all the mandatory respondents' rates using total adverse facts available (or "total AFA") and selected the highest dumping margin alleged in the petition, 78.17 percent, as AFA.  *See Pro-Team I*, 419 F. Supp. 3d at 1325.  In *Pro-Team I*, the court addressed five sets of plaintiffs' challenges to the *Final Results*.[2]  The court remanded the *Final Results* with respect to Commerce's reliance on total facts available (neutral or adverse) for Pro-Team.  *See id.* at 1334.  The court sustained Commerce's reliance on total facts otherwise available for Unicatch but remanded the agency's use of an adverse inference.  *See id.* at 1340.

---

Remand Results.  *See* Public Remand J.A., ECF No. 118; Confidential Remand J.A. ("2RCJA"), ECF No. 117.  Commerce's calculations used to corroborate the petition margin were filed separately by Plaintiffs.  Confidential Pls.' Resp. to Court Request for Additional Docs., Attach. 1, Attach. 2 ("SAS Worksheet"), ECF No. 120; *see also* [Public] Pls.' Resp. to Court Request for Additional Docs., ECF No. 121.  The court references the confidential version of the relevant record documents, unless otherwise specified.

[2] The five sets of plaintiffs consist of lead Plaintiffs Pro-Team Coil Nail Enterprise, Inc. and PT Enterprise Inc. (together, "Pro-Team"); Consolidated Plaintiffs Unicatch Industrial Co., Ltd. and TC International, Inc. (together, "Unicatch"); Consolidated Plaintiff PrimeSource Building Products, Inc.; Consolidated Plaintiffs Hor Liang Industrial Corp. and Romp Coil Nails Industries (referred to simply as "Hor Liang"); and Plaintiff-Intervenor S.T.O. Industries, Inc ("STO").  "Respondents" refers to the respondents that participated in the administrative proceedings associated with the Second Remand Results: Unicatch and Hor Liang.  *See* Cmts. in Resp to Draft Results of Redetermination Pursuant to Court Remand (Jan. 28, 2021) ("Respondents' 2R Case Br.") at 1, 2RCR 2–3, 2RPR 2, 2RCJA Tab 11.

In the first remand redetermination, Commerce calculated a company-specific dumping margin of zero percent for Pro-Team.  *See* Final Results of [First] Redetermination Pursuant to Court Remand ("First Remand Results") at 6–8, 32, ECF No. 71-1.  Commerce continued to rely on total AFA to determine Unicatch's margin and provided additional explanation supporting that decision.  *See id.* at 8–15, 20–28. Commerce established a rate of 39.09 percent for the non-individually examined respondents (e.g., Hor Liang) using a simple average of Pro-Team's zero percent margin and Unicatch's 78.17 percent margin.  *Id.* at 15–16, 29–32.

In *Pro-Team II*, the court sustained Commerce's calculation of Pro-Team's rate and the agency's reliance on total AFA for Unicatch.  483 F. Supp. 3d at 1245.  The court, however, remanded Commerce's reliance on the petition rate as AFA because Commerce did not adequately corroborate the rate.  *See id.* at 1251.

In the Second Remand Results, Commerce corroborated the petition rate using certain of Pro-Team's transaction-specific margins in this review and what Commerce referred to as a "component approach."  Second Remand Results at 7–9.  Commerce established a rate of 52.11 percent for Hor Liang by taking a simple average of the three[3] mandatory respondents' rates.  *See id.* at 12–13.

Unicatch submitted comments contending that Commerce did not adequately corroborate the petition rate and failed to consider the totality of the circumstances in

---

[3] Commerce had initially selected Pro-Team and Bonuts Hardware Logistics Co., LLC ("Bonuts") as mandatory respondents.  *See Pro-Team I*, 419 F. Supp. 3d at 1325.  After Bonuts indicated that it would not participate in the review Commerce added Unicatch as a mandatory respondent.  *Id*.

selecting the petition rate as AFA. *See* Confidential Consol. Pls., [Unicatch] Cmts. on Redetermination ("Unicatch's Cmts.") at 8–14, ECF No. 107. Hor Liang submitted comments contending that Commerce's calculation of the rate for non-individually examined respondents was not reasonably reflective of Hor Liang's potential dumping margin and was otherwise unsupported by substantial evidence or not in accordance with the law. *See* Confidential Consol. Pls. [Hor Liang] Cmts. on Redetermination ("Hor Liang's Cmts.") at 4–14, ECF No. 105.[4] Defendant United States ("the Government") and Defendant-Intervenor Mid Continent Steel & Wire, Inc. ("Mid Continent") each submitted comments urging the court to sustain Commerce's Second Remand Results in their entirety. *See* Confidential Def.'s Resp. to the Parties' Cmts. on the Dep't of Commerce's Final Results of Redetermination ("Gov't's Cmts."), ECF No. 115; Confidential Def.-Int. [Mid Continent's] Cmts. in Supp. of Final Remand Results ("Mid Continent's Cmts."), ECF No. 113.

For the following reasons, the court sustains Commerce's selection of the petition rate as AFA for Unicatch and remands Commerce's use of a simple average of the mandatory respondents' rates to establish the rate for non-individually examined respondents for further explanation or reconsideration.

---

[4] STO's comments incorporated by reference the arguments presented in Unicatch's comments and Hor Liang's comments. *See* Pl.-Int.'s Cmts. to Redetermination on Remand, ECF No. 109.

<strong>JURISDICTION AND STANDARD OF REVIEW</strong>

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1259 (2014)).

<strong>DISCUSSION</strong>

**I.   Commerce's Selection and Corroboration of the Petition Rate for Unicatch**

      **A.  Background**

For the *Final Results*, the agency relied on total AFA for Unicatch and, for that purpose, selected the petition rate of 78.17 percent.  *See Pro-Team I*, 419 F. Supp. 3d at 1325, 1335–36.  In *Pro-Team I*, the court sustained Commerce's reliance on total facts otherwise available for Unicatch but remanded Commerce's use of an adverse inference.  *Id.* at 1340.  Commerce continued to rely on total AFA for Unicatch and to use the petition rate as AFA.  *See* First Remand Results at 15.  Commerce relied on "information provided in the petition and corresponding discussion in the notice [of

---

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless stated otherwise.

initiation of the administrative review]" to corroborate the petition rate.  *Pro-Team II*, 482

F. Supp. 3d at 1250 (citing I&D Mem. at 21–22 & nn.86–87).

In *Pro-Team II*, while the court sustained Commerce's use of an adverse

inference, the court remanded Commerce's reliance on the petition rate for

reconsideration or further explanation.  *See id.* at 1249–1251.  The court explained that

"Commerce's determination that the petition rate is reliable and relevant for purposes of

this administrative review, based on nothing more than its pre-initiation review of the

data, is unsupported by substantial evidence and reasoned explanation."  *Id.* at 1251.

For the Second Remand Results, Commerce continued to rely on the petition

rate as AFA.  *See* Second Remand Results at 10.  To corroborate the margin,

Commerce compared the rate to certain of Pro-Team's transaction-specific dumping

margins calculated in this review.  *See id.* at 8.  Commerce found that a sufficient

number of transaction-specific margins exceeded the petition rate for purposes of

corroboration.  *Id.*; *see also* SAS Worksheet, ECF p. 145 (identifying the transaction

specific margins); Respondents' 2R Case Br. at 7 (same).

Commerce rejected Respondents' contention that Commerce relied on too few

transaction-specific dumping margins to corroborate the petition rate and that the

transactions relied on accounted for too small a portion of Pro-Team's transactions.

*See* Second Remand Results at 16–17.  Commerce also rejected Respondents'

assertion that the transaction-specific margins were aberrational and, thus, unreliable

for purposes of corroboration.  *See id.* at 17–18.  Commerce found that "nothing on the

record indicates that the[ corroborating] transactions were unique in some way or were conducted outside of the ordinary course of business." *Id.* at 18.

Commerce determined that the 78.17 percent petition rate was not punitive considering Unicatch's non-cooperative conduct and was necessary to deter such conduct in the future. *See id.* at 10, 19. Citing the *Final Results*, "Commerce explained why it could not use a gap-filling alternative adjustment because this would only raise more questions regarding the proper inclusion or exclusion of costs." *Id.* at 10 & n.35 (citation omitted). Commerce further reasoned that Unicatch's conduct had delayed the proceedings, thereby allowing Unicatch to attempt to manipulate the amount of time Commerce and interested parties had to address issues raised by the response. *See id.* at 18–19.

### B. Legal Framework

When using an adverse inference to select from among the facts otherwise available, Commerce may rely "on information derived from-- (A) the petition, (B) a final determination in the investigation . . . , (C) any previous [administrative] review . . . , or (D) any other information placed on the record." 19 U.S.C. § 1677e(b)(2). "When Commerce 'relies on secondary information rather than on information obtained in the course of an investigation or review,' it 'shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal.'" *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1299 (Fed. Cir. 2021) (alteration in original) (quoting 19 U.S.C. § 1677e(c)(1)).

Corroboration does not require Commerce to estimate what Unicatch's dumping margin would have been if it had cooperated or "demonstrate that the . . . dumping margin used by the [agency] reflects an alleged commercial reality of [Unicatch]." 19 U.S.C. § 1677e(d)(3).  Instead, "corroborating information means determining that [the information] 'has probative value.'"  *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016) (citing Statement of Administrative Action ("SAA")[6] accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199; 19 C.F.R. § 351.308).

### C.  Parties' Contentions

Unicatch[7] contends that the underlying transactions used to corroborate the petition rate represent too small a portion of Pro-Team's total transactions, quantity sold, and total sales value.  *See* Unicatch's Cmts. at 2–3.  Further, according to Unicatch, the transaction-specific margins are unreliable because they are substantially higher than the rest of Pro-Team's transaction-specific margins.  *See id.* at 3.  Unicatch also avers that Commerce "did not examine the totality of the circumstances" or

---

[6] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act." 19 U.S.C. § 3512(d).

[7] Hor Liang agrees with Unicatch's arguments that Commerce failed to corroborate the petition rate and that Commerce's application of the petition rate failed to consider the totality of the circumstances in selecting the petition rate as AFA.  *See* Hor Liang's Cmts. at 2–4.

"attempt to balance the seriousness of Unicatch's conduct against the need to apply a

78.17[ percent] rate to ensure deterrence."  *Id.* at 10.

The Government counters that there is no minimum number of transactions

necessary for corroboration when Commerce relies on the transaction-specific margin

methodology.  *See* Gov't Cmts. at 7–8.  The Government further contends that

Commerce explained that the transactions were not "aberrational in terms of individual

quantity or unusual [in] terms of sale."  *Id.* at 8 (citing Second Remand Results at 16);

*see also* Mid Continent's Cmts. at 4–5.  The Government and Mid Continent contend

that the 78.17 percent rate is not punitive because Commerce explained that the rate

was necessary to incentivize Unicatch to cooperate in the future.  Gov't Cmts. at 11–

12; Mid Continent's Cmts. at 8–9.

### D.  Analysis

#### 1.  Commerce's Use of Transaction-Specific Margins to Corroborate the Petition Rate is Supported by Substantial Evidence and in Accordance with the Law

Transaction-specific margins may have probative value when the rate selected

as AFA falls within a range of those transaction-specific margins.  *See Deacero*, 996

F.3d at 1300 (sustaining Commerce's determination that the highest rate alleged in the

petition was relevant when it was in the range of transaction-specific margins calculated

in the immediately preceding administrative review); *Papierfabrik*, 843 F.3d at 1381

(sustaining Commerce's determination that the selected rate "fell within the range of

transaction-specific margins calculated in [the second administrative review]") (alteration

in original) (citation omitted).  Here, Commerce explained that the petition margin was

within the range of certain transaction-specific margins calculated for Pro-Team in this review.  *See* Second Remand Results at 8, 16.  In fact, the petition rate fell well below the transaction-specific margins relied upon by Commerce, thus, based on the further discussion below, the court finds that Commerce sufficiently corroborated the petition rate using data reasonably at its disposal.  *See id.* at 16; *Deacero*, 996 F.3d at 1300.

Unicatch advances two challenges to Commerce's transaction-specific margin methodology: (1) the underlying sales do not account for a sufficient portion of Pro-Team's sales to be considered reliable; and (2) the margins are aberrationally high. *See* Unicatch's Cmts. at 2–6.  Unicatch's arguments are not persuasive.

Depending on the particular facts, a single sale may suffice for purposes of corroboration.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) (a 30.95 percent margin was supported by a single sale under the specific facts of the case.).  Here, Commerce explained that Respondents failed to demonstrate that the number of transactions was so insufficient as to call into question the data underlying the transaction-specific margins.  *See* Second Remand Results at 17.  "Neither the statute nor Commerce's practice includes a requirement that the corroborating transactions represent a minimum number or certain percentage of total sales," and Respondents did not cite authority to support their position.  *Id.*   The court finds no error in Commerce's corroboration analysis, which fulfills the statutory requirement for corroboration, is based on substantial evidence, and is otherwise consistent with applicable judicial precedent.  *See PAM, S.p.A. v. United States*, 582

F.3d 1336, 1340 (Fed. Cir. 2009) ("There must be at least enough evidence to allow reasonable minds to differ.").

Next, Unicatch contends that the transaction-specific margins themselves are aberrational because they are significantly higher than Pro-Team's other transaction-specific margins in this review. *See* Unicatch's Cmts. at 3. Commerce rejected this argument because "nothing on the record indicates that the[] . . . [corroborating] transactions were unique in some way or were conducted outside the ordinary course of business." Second Remand Results at 17-18. Moreover, "the mere fact that a margin is unusually high does not mean that it lacks probative value and hence cannot be used for corroboration." *Papierfabrik*, 843 F.3d at 1381.[8]

Before the court, Unicatch repeats the arguments that Commerce rejected. *See* Unicatch's Cmts. at 2–4. However, Unicatch does not identify any evidence that Commerce failed to consider or authority contrary to the agency's conclusions. As noted above, the petition rate that Commerce corroborated, rather than being within the range of the transaction-specific margins in question, was well below those transaction-specific margins. In the absence of any arguments from Unicatch beyond simply

---

[8] Unicatch relies on several cases in which the court discussed aberrational data in the context of Commerce's surrogate country or surrogate value selection. *See* Unicatch's Cmts. at 5 (collecting cases). Commerce applies different standards when it evaluates the reliability of surrogate data to value factors of production in a non-market economy case than when it corroborates information to use as AFA. *Compare Papierfabrik*, 843 F.3d at 1380 (explaining that corroborating information means the information has probative value), *with Jacobi Carbons AB v. United States*, 42 CIT ___, ___, 313 F. Supp. 3d 1308, 1314–15 (2018) (discussing the "best information available" standard in selecting a primary surrogate country pursuant to 19 U.S.C. § 1677b(c)(1)). Unicatch's reliance on cases discussing surrogate data is misplaced.

objecting to the rate as too high, the court finds that Commerce adequately

corroborated the petition rate.[9]

### 2. Substantial Evidence Supports Commerce's Conclusion that the Petition Rate was not Punitive and was Appropriate to Incentivize Compliance in the Future

"It is well established both that the purpose of AFA is to incentivize cooperation,

not to impose punitive, aberrational, or uncorroborated margins, and that Commerce's

AFA determinations must be reasonable on the record." *Deacero*, 996 F.3d at 1300–01

(citations omitted).  The U.S. Court of Appeals for the Federal Circuit ("the Federal

Circuit") has indicated further that "Commerce should consider the overall facts and

circumstances of each case, including the level of culpability of the non-cooperating

party in an AFA analysis." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301

(Fed. Cir. 2019).

Here, Commerce adequately considered the totality of the circumstances in

selecting the petition rate.  Commerce found that "Unicatch failed to cooperate to the

best of its ability by repeatedly failing to submit a cost reconciliation, despite multiple

requests from Commerce" and, in so doing, its behavior delayed the proceedings,

---

[9] Commerce also asserts that it corroborated the petition rate using a component approach.  Commerce examined a range of transaction-specific normal values and net U.S. prices reported by Pro-Team and compared them to the normal value and net U.S. price upon which the petition rate is based.  *See* Second Remand Results at 8–9, 18. Commerce found that the normal value and net U.S. price used for the petition rate were each well within the range of many normal value and U.S. transactions reported by Pro-Team.  *Id.* at 9, 18.  Unicatch objects that this approach fails to account for product comparisons and is irrelevant in determining the reliability of the selected margin.  *See* Unicatch's Cmts. at 6–7.  Because the court finds that Commerce adequately corroborated the petition rate using the transaction-specific margin methodology, the court need not address Unicatch's objections to the component approach.

"limit[ing] the time that Commerce and other interested parties [had] to analyze such information."  Second Remand Results at 9.  By submitting still incomplete responses closer to the deadline for the preliminary results, Unicatch limited the ability of Commerce or interested parties to pose follow-up questions and further address deficiencies.  *Id.* at 9–10.

Commerce explained that Respondents' alternative methodology for selecting an AFA rate would not deter future non-cooperative conduct.  *See id.* at 19.  Respondents simply provided a list of Pro-Team's "transaction-specific margins and argue[d] . . . that each one [was] too high, until [they] arriv[ed] at a margin that [they] . . . deemed appropriate."  *Id.*  As Commerce found, however, such an approach would permit a respondent to cherry pick both the information it provided and the consequences for failing to provide a complete response to the agency.  *Id*.

Unicatch complains to the court that the agency failed to consider the "totality of the circumstances" or the seriousness of Unicatch's conduct in selecting the AFA rate.  *See* Unicatch's Cmts. at 10, 13–14.  However, as set forth above, Commerce explained why, in light of Unicatch's conduct, the agency selected the 78.17 percent rate as AFA and corroborated that rate using record information from the administrative review.[10] Commerce also discussed its rationale that the selected rate would provide a

---

[10] In that vein, the court is not persuaded that the petition rate is punitive.  *See* Unicatch's Cmts. at 13–14.  It is well settled that "[a]s long as a rate is properly corroborated according to the statute, Commerce has acted within its discretion and the rate is not punitive."  *Deacero*, 996 F.3d at 1300 (quoting *Papierfabrik*, 843 F.3d at 1382).  As explained above, Commerce properly corroborated the petition rate.

reasonable deterrent against future non-cooperative behavior.  Commerce thus adhered

to the court's admonition to avoid relying on "the same rationale [the agency] supplied

for its use of AFA."  *Pro-Team II*, 483 F. Supp. 3d at 1252.

### 3.  Conclusion

Substantial evidence supports Commerce's use of the transaction-specific

margin methodology for purposes of corroboration and the agency's consideration of

Unicatch's conduct in selecting the AFA rate.

## II.   Commerce's Determination of the Rate for Non-Individually Examined Respondents

### A.  Background

In the *Final Results*, Commerce established a rate of 78.17 percent for non-

individually examined respondents such as Hor Liang by averaging the mandatory

respondents' rates (Pro-Team, Bonuts, and Unicatch), all of which were based on total

AFA.  83 Fed. Reg. at 6,164; *see also* I&D Mem. at 5.  In its amended complaint, Hor

Liang alleged that Commerce's "application of a rate based on total AFA to [Hor Liang]

. . . under [19 U.S.C. § 1673d(c)(5)(B)] . . . [was] not supported by substantial evidence."

Compl. ¶ 28, *Hor Liang Indus. Corp. v. United States*, Court No. 18-cv-00029 (CIT Mar.

6, 2018) ("Hor Liang's Am. Compl.").

The Government moved to dismiss the amended complaint and the court granted

the motion in part and denied it in part.  *See Hor Liang Indus. v. United States*, 42 CIT

___, 337 F. Supp. 3d 1310 (2018).  Relevant to this discussion, the court dismissed

count one of the amended complaint.  *See id.* at 1324–28.  Hor Liang was allowed to

proceed with count two in which it requested that, in the event Commerce calculated a

company-specific rate for any of the mandatory respondents, Commerce should

calculate Hor Liang's margin using such calculated rate(s).  *See id.* at 1325 n.24.

In the Second Remand Results, Commerce established a rate of 52.11 percent

for Hor Liang.  Second Remand Results at 12.  Commerce took a simple average of the

mandatory respondents' rates—including Bonuts.[11]  *See id.* at 12–13.  Commerce

asserted that it relied on the "expected method" to calculate the rate.  *See, e.g.*, *id.* at 23

& nn.72, 75 (citations omitted).  Despite its assertion, Commerce later acknowledged

that it departed from the expected method reportedly because it lacked volume data for

Bonuts.  *Id.* at 26–27.  Without further explanation, Commerce indicated that the

missing or unusable "volume data" were Bonuts' sales values.  *Id.* at 25–26.  Commerce

also rejected Respondents' contention that the 52.11 percent rate was not reasonably

reflective of Hor Liang's potential dumping margin.  *Id.* at 24 & n.77 (citation omitted).

## B.  Legal Framework

Section 1673d(c)(5) governs the method for establishing the all-others rate for

non-individually examined companies in an investigation.  While that statutory provision

applies to investigations, Commerce uses that same methodology to determine the rate

for non-individually examined companies in administrative reviews.  *See Albemarle*

*Corp. v. United States*, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).  When, as here, the

---

[11] In the First Remand Results, Commerce calculated a rate of zero percent for Pro-Team and continued to base Unicatch's rate on total AFA.  First Remand Results at 25, 32.  For non-individually examined respondents, Commerce determined a rate of 39.09 percent using a simple average of Pro-Team's rate and Unicatch's rate, inadvertently omitting Bonuts' rate from the calculation.  *See id.* at 29–32; Second Remand Results at 27–28.

rates for the mandatory respondents are all zero, *de minimis*, or determined entirely on

the basis of facts otherwise available, Commerce "may use any reasonable method to

establish the estimated all-others rate for exporters and producers not individually

investigated, including averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."  19 U.S.C.

§ 1673d(c)(5)(B).

> The SAA explains that
>
> [t]he expected method in such cases will be to weight-average the zero
> and *de minimis* margins and margins determined on the basis of the facts
> available, provided that volume data is available.  If that method is not
> feasible, or if it results in an average that would not be reasonably
> reflective of potential dumping margins for non-investigated exporters or
> producers, Commerce may use other reasonable methods.

SAA at 873, 1994 U.S.C.C.A.N. at 4201.  The SAA's reference to "other reasonable

methods" may include taking a simple average of the mandatory respondents' zero, *de*

*minimis*, and AFA rates.  *See Solianus, Inc. v. United States*, 43 CIT ___, ____, 391 F.

Supp. 3d 1331, 1338 (2019) (addressing the Federal Circuit's discussion of

Commerce's use of a simple average in *Yangzhou Bestpak Gifts & Crafts Co. v. United*

*States*, 716 F.3d 1370 (Fed. Cir. 2013)).

### C.  Parties' Contentions

Hor Liang contends that Commerce blindly relied on the "expected method"

without considering evidence that doing so would result in a rate not reasonably

reflective of Hor Liang's potential dumping margin.  *See* Hor Liang's Cmts. at 4–10.

Next, Hor Liang contends that it was unreasonable for Commerce to calculate the rate

for non-individually examined respondents using a simple average as opposed to a weighted-average.  *See id*. at 11–14.

The Government avers that the court should not consider Hor Liang's challenges to its rate from the Second Remand Results because the court previously dismissed the count that encompass these challenges.  *See* Gov't Cmts. at 16–17 n.5.  In the alternative, the Government contends that Hor Liang's rate is representative of its potential dumping margin because the statute assumes the mandatory respondents' margins are representative of non-examined respondents' margins, and Hor Liang has not provided evidence rebutting that assumption.  *Id*. at 16–21 (citing, *inter alia*, *Albemarle*, 821 F.3d at 1355).  Finally, the Government and Mid Continent contend that Commerce was permitted to depart from the expected method and calculate a simple average under the circumstances.  *See id.* at 22–23; Mid Continent's Cmts. at 14, 21–22.

### D.  Analysis

#### 1.  Hor Liang's Challenges to the Second Remand Results are Properly Before the Court

In *Hor Liang*, the court found that the plaintiff (Hor Liang) had not exhausted its administrative remedies in contesting Commerce's assignment of a margin based entirely on AFA to a cooperating non-examined respondent and no exception to the exhaustion doctrine applied.  337 F. Supp. 3d at 1325–28.  Accordingly, the court dismissed that count of Hor Liang's amended complaint.  *See id*. at 1328.  In count two, however, Hor Liang requested "a recalculated rate in the event [Pro-Team] or Unicatch succeed in obtaining a calculated rate in their companion actions."  *Id*. at 1325 n.24.

The court allowed this challenge to proceed because it "relate[d] to matters that post-date the *Final Results*, and thus, [was] not subject to the exhaustion doctrine." *Id*.

Hor Liang now argues that Commerce did not consider evidence that the rate it established for Hor Liang, which was based in part on Pro-Team's calculated margin, was not reasonably reflective of Hor Liang's potential dumping margin. *See* Hor Liang's Cmts. at 4–10. This is a different argument based on a different rate than was considered in *Hor Liang.* This argument falls within the scope of count two of the amended complaint because it requests relief based on Commerce calculating a company-specific rate for Pro-Team. *See* Hor Liang's Am. Compl. ¶ 31. Moreover, this argument was not subject to the exhaustion doctrine and could not be because it "post-date[s] the *Final Results*." *Hor Liang*, 337 F. Supp. 3d at 1325 n.24. Thus, the court rejects the Government's contention that Hor Liang's challenges to the Second Remand Results are not properly before the court. *See* Gov't's Cmts. at 16–17 n.5.

### 2. Commerce's Departure from the Expected Method is Remanded for Further Explanation or Reconsideration

As an initial matter, at various times each of the parties and Commerce incorrectly state that Commerce calculated the rate for non-individually examined respondents using the expected method. *See, e.g.*, Second Remand Results at 23; Hor Liang's Cmts. at 8; Gov't's Cmts. at 3. While weight-averaging the rates of the mandatory respondents is the expected method, *see* SAA at 873, 1994 U.S.C.C.A.N. at 4201, that is not the method that Commerce employed. Rather, Commerce calculated a *simple* average of the mandatory respondents' rates. *See, e.g.*, Second Remand Results at 25–26.

The SAA provides that Commerce may depart from the expected method when "volume data is [not] available."  SAA at 873, 1994 U.S.C.C.A.N. at 4201.  Here, Commerce stated that it departed from the expected method because "the volume data for Bonuts [were] incomplete, and therefore, unusable for purposes of calculating a weighted-average."  Second Remand Results at 26–27.

Commerce, however, had placed on the record U.S. import volume data from U.S. Customs and Border Protection ("Customs"), which was broken down by producer/exporter, and which Commerce relied on to select the mandatory respondents.  *See* Selection of Respondents for the 2015-2016 Admin. Review (Nov. 29, 2016) ("Respondent Selection Mem.") at 9, Attach., CR 6, PR 38, 2RCJA Tab 2); Selection of Additional Mandatory Respondent (Feb. 9, 2017) at 3, PR 76, 2RCJA Tab 7.  U.S. import volumes for Bonuts were included in this data.  *See* Respondent Selection Mem., Attach.  When Commerce asserted that the volume data were incomplete, it did not explain why the Customs data, which were reliable for purposes of respondent selection, were not also reliable for purposes of using the "expected method" for determining the rate for non-individually investigated companies.  Because Commerce failed to address record evidence regarding the volume of Bonuts' U.S. shipments and otherwise failed to justify its departure from the expected methodology, that departure is unsupported by substantial evidence.[12]  *See NMB Singapore Ltd. v. United States*, 557

---

[12] The court is not persuaded by Commerce's assertion that it lacked "sales values" for Bonuts.  Second Remand Results at 26.  Commerce uses *quantity/volume* data, not *sales values*, to weight-average respondent rates.  *See, e.g.*, Certain Activated Carbon

F.3d 1316, 1319 (Fed. Cir. 2009) ("[T]he path of Commerce's decision must be reasonably discernable to a reviewing court.").[13]  Because the court finds that substantial evidence does not support Commerce's departure from the expected method, the court does not reach Hor Liang's contention that the 52.11 percent margin was not reasonably reflective of Hor Liang's potential dumping margin.  Hor Liang's Cmts. at 4–10.  Nevertheless, any arguments that Hor Liang wishes to preserve should be raised on remand so that Commerce has an opportunity to address them on the record.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Second Remand Results are sustained with respect to Commerce's selection and corroboration of the petition rate as AFA for Unicatch; it is further

---

from the People's Republic of China: Issues and Decision Mem. for the Final Results of the Fourth Antidumping Duty Admin. Review, A-570-904 (Nov. 2, 2012) at 28–30, *available at* https://enforcement.trade.gov/frn/summary/prc/2012-27423-1.pdf (last visited July 30, 2021).  Commerce did not explain the relevance of the missing sales values to weight-averaging the mandatory respondents' rates.

[13] Hor Liang also contends that Commerce should have excluded Bonuts when determining the rate for non-individually examined respondents.  Hor Liang's Cmts. at 11.  In the First Remand Results, Commerce inadvertently omitted Bonuts from that weighted-average.  *See* Second Remand Results at 27.  Commerce generally has authority to correct ministerial errors on remand, particularly when they relate to issues under litigation.

**ORDERED** that Commerce's Second Remand Results are remanded for reconsideration or further explanation of Commerce's departure from the expected method in determining the rate for non-individually examined respondents; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before October 13, 2021; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 3,000 words.

/s/      Mark A. Barnett____
Mark A. Barnett, Chief Judge

Dated: ____July 30, 2021____
New York, New York