A-583-854
Remand:  Slip Op:  21-93
POR:  05/20/2015-06/30/2016
**Public Document**
E&C/OVI:  SJ

**Results of Redetermination Pursuant to Court Remand**
**Certain Steel Nails from Taiwan**
***Pro-Team Coil Nail Enterprise, Inc., et al. v. United States*,**
**Consol. Court No. 18-00027, Slip Op. 21-93 (CIT July 20, 2021)**

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the third remand order of the U.S. Court of International Trade (the

Court) in *Pro-Team Coil Nail Enterprise, Inc. v. United States*, Consol. Court No. 18-00027, Slip

Op. 21-93 (July 30, 2021) (*Third Remand Order*).  These final results of redetermination concern

the final results of the antidumping duty administrative review of certain steel nails from

Taiwan.[1]  Commerce issued its First Redetermination in this proceeding on March 25, 2020,[2] and

its Second Redetermination on February 23, 2021.[3]

In the *Third Remand Order*, the Court sustained Commerce's selection and corroboration

of the petition rate as adverse facts available (AFA) for Unicatch Industrial Co., Ltd. (Unicatch),

but remanded one issue to Commerce:  the use of a simple average of the mandatory

respondents' rates to establish the rate for non-individually examined respondents.  The Court

found that Commerce's departure from the expected method (*i.e.*, using a weighted average) in

favor of calculating a simple average to calculate the rate for non-individually examined

---

[1] *See Certain Steel Nails from Taiwan:  Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015–2016*, 83 FR 6163 (February 13, 2018) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See* "Final Results of Redetermination Pursuant to Court Remand:  Certain Steel Nails from Taiwan," dated March 25, 2020 (First Redetermination).
[3] *See* "Final Results of Redetermination Pursuant to Court Remand:  Certain Steel Nails from Taiwan," dated February 23, 2021 (Second Redetermination).

respondents is unsupported by substantial evidence.  Specifically, the Court found that Commerce had placed on the record U.S. import volume data from U.S. Customs and Border Protection (CBP), which Commerce relied on to select mandatory respondents.  The Court found that Commerce did not explain why these CBP data were not reliable for purposes of using a weighted average to calculate the rate for the non-individually examined respondents.[4]

On September 15, 2021, we released our Draft Results of Redetermination to interested parties.[5]  On September 22, 2021, we received comments from domestic interested party, Mid Continent Steel & Wire (Mid Continent)[6] and respondent interested parties, Unicatch, TC International, Inc. (TC International), Hor Liang Industrial Corp. (Hor Liang), and Romp Coil Nails Industries Inc. (Romp Coil) (collectively, respondent interested parties).[7]  We respond to these comments below.  For these final results of remand redetermination, we have reconsidered our draft results of redetermination, in light of the record and party arguments, and we find that we have the available volume data and that it is feasible to rely on a weighted average of the margins of the three mandatory respondents to determine the rate for non-individually examined respondents.

---

[4] *See Third Remand Order* at 20-21.

[5] *See* "Draft Results of Redetermination Pursuant to Court Remand Certain Steel Nails from Taiwan," dated September 15, 2021 (Draft Results of Redetermination).

[6] *See* Mid Continent's Letter, "Certain Steel Nails from Taiwan:  Comments on Draft Results of Redetermination Pursuant to Court Remand in *Pro-Team Coil Nail Enterprise, Inc., et al. v. United States*, Consol. Court No. 18-00027, Slip Op. 21.93 (CIT July 20, 2021) dated September 22, 2021 (Mid Continent Comments).

[7] *See* Respondent Interested Parties' Letter, "Comments in Response to Draft Results of Redetermination Pursuant to Court Remand, *Certain Steel Nails from Taiwan, Pro-Team Coil Enterprise, Inc., et al. v. United States*, Consol. Court No. 18-00027, Slip Op. 21-93 (CIT July 20.  2021)," dated September 22, 2021 (Respondent Interested Parties Comments).

## II.      BACKGROUND

In the *Final Results*, Commerce established a rate of 78.17 percent for the non-individually examined respondents by averaging the dumping margins of the three mandatory respondents (*i.e.*, PT Enterprise Inc./Pro-Team Coil Nail Enterprise, Inc. (collectively, PT/Pro-Team), Unicatch, and Bonuts Hardware Logistic Co., Ltd. (Bonuts)), all of which were based on total AFA.[8]  With respect to PT/Pro-Team and Unicatch, the companies responded to Commerce's questionnaire but Commerce determined that their responses were incomplete and unreliable, therefore warranting the application of total AFA pursuant to section 776(a) and (b) of the Tariff Act of 1930, as amended (the Act).  With respect to Bonuts, the company failed to respond to Commerce's questionnaire, also warranting the application of total AFA pursuant to section 776(a) and (b) of the Act.

In the First Redetermination, Commerce calculated a margin of zero percent for PT/Pro-Team and continued to apply the AFA margin of 78.17 percent for Unicatch.[9]  For the non-individually examined respondents subject to this litigation, *i.e.*, Hor Liang and Romp Coil, Commerce determined a rate of 39.09 percent using a simple average of PT/Pro-Team's rate and Unicatch's rate.[10]

In the Second Redetermination, Commerce reexamined its calculation of the non-individually examined companies' rate because it inadvertently did not include the 78.17 percent AFA rate applied to mandatory respondent Bonuts in the recalculated non-examined companies' rate in the First Redetermination.[11]  Commerce assigned a rate of 52.11 percent to the non-examined companies Hor Liang and Romp Coil, based on the simple average of the AFA rates

---

[8] *See Final Results*, 83 FR at 6164, and accompanying IDM at 5.
[9] *See* First Redetermination at 32.
[10] *Id*.
[11] *See* Second Redetermination at 11-13.

assigned to Unicatch and Bonuts and the zero percent margin applied to PT/Pro-Team.[12]

Commerce stated that it relied on a simple average in the Second Redetermination because the

record lacked usable volume data for Bonuts with which to calculate a weighted average.[13]

In the *Third Remand Order*, the Court ruled that Commerce's departure from the

expected method (*i.e.*, using a weighted average) in favor of a simple average to calculate the

rate for non-individually examined respondents was not supported by substantial evidence.

Specifically, the Court found that Commerce had placed on the record U.S. import volume data

from CBP, which Commerce relied on to select mandatory respondents.  The Court found that

Commerce did not explain why these CBP data were not reliable for purposes of using a

weighted average to calculate the rate for the non-individually examined respondents.[14]  The

Court remanded for reconsideration or further explanation why Commerce deviated from the

expected method to determine the rate for non-individually examined respondents.  In the Draft

Results of Redetermination, we relied on a simple average to calculate the rate for non-examined

respondents.[15]  After considering parties' comments, for these final results of remand

redetermination, we have determined that a weighted average in this instance is feasible and used

a weighted average to calculate the rate for non-examined respondents.

## III.   ANALYSIS

In compliance with the Court's instruction, for purposes of these final results of

redetermination, we have reconsidered our application of a simple average instead of a weighted

---

[12] *Id.*

[13] *See* Second Redetermination at 11-13 and 20-28 ("… we determine that the volume data for Bonuts are incomplete, and therefore, unusable for purposes of calculating a weighted-average.").

[14] *See Third Remand Order* at 20-21.

[15] *See* Draft Results of Redetermination.

average to calculate the rate for non-individually examined respondents and we have revised our calculation to rely on a weighted-average, consistent with the *Third Remand Order*.

The statute and Commerce's regulations do not address the establishment of a rate to be applied to companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act.[16]  Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in a market economy investigation, for guidance when calculating the rate for companies which were not selected for individual review in an administrative review.  Section 735(c)(5) of the Act states that this rate "shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776" of the Act.  Pursuant to section 735(c)(5)(B) of the Act, however, if the estimated weighted-average dumping margins established for all exporters and producers individually examined are zero, *de minimis*, or determined based entirely on facts otherwise available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated."  The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA) further explains that when "the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis ...* {t}he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts

---

[16] *See Final Results* IDM at 5.

available, provided volume data is available.[17]  If that method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."[18]  The SAA's reference to "other reasonable methods" may include relying on a simple average of the mandatory respondents' zero, *de minimis*, and AFA rates.[19]

Here, the margin calculated for PT/Pro-Team is zero percent, and the margins assigned to Unicatch and Bonuts are based entirely on AFA.  Because the rates for the mandatory respondents are all zero, *de minimis*, or determined entirely on the basis of facts otherwise available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted-average dumping margins determined for the exporters and producers individually investigated."[20]

As noted above, the Court found that the SAA states that the weight-averaging under the expected method occurs *provided the volume data {are} available*.[21]  The SAA states that if that method is not feasible, Commerce may use other reasonable methods.[22]  In this case, although the record contains the reported volume data for mandatory respondents PT/Pro-Team and Unicatch, the record does not contain any reported volume data for mandatory respondent Bonuts, because Bonuts did not respond to Commerce's requests for information.  Accordingly, we find that the record does not contain the reported volume data from all of the three mandatory respondents.

---

[17] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 873.
[18] *See* SAA at 873.
[19] *See Solianus*, 391 F. Supp. 3d 1331, 1338 (2019).
[20] *See* section 735(c)(5)(B) of the Act.
[21] *See Third Remand Order* at 19-20.
[22] *See* SAA at 873.

The Court noted in the *Third Remand Order* that Commerce "had placed on the record U.S. import volume data from {CBP}, which was broken down by producer/exporter, and which Commerce relied on to select the mandatory respondents," and that "U.S. import volumes for Bonuts were included in this data."[23]   The Court found that Commerce asserted in the Second Redetermination that the volume data were incomplete, but that Commerce did not explain why the CBP data, which were reliable for purposes of respondent selection, were not also reliable for purposes of using the "expected method" for determining the rate for non-individually examined companies.[24]

In the underlying review, Commerce placed CBP data on the record for purposes of respondent selection, consistent with its normal practice.[25]   There are possible situations in which volume data may not be feasibly used for various purposes, including the calculation of a weighted average under the expected method as directed by the SAA.   For example, in some instances, business proprietary information may be revealed[26] or the volume data may not be the best reflection of the volume of subject merchandise.[27]

However, here, after considering parties' arguments and in light of the evidence on this particular record, we find that the CBP data may be feasibly used in this instance to calculate a weighted average as directed by the SAA.   Thus, we find that the use of a weighted average of

---

[23] *See Third Remand Order* at 20.

[24] *Id.*

[25] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 FR 62720 (September 12, 2016); *see also* Memorandum, "Selection of Respondents for the 2015-2016 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from Taiwan," dated November 29, 2016.

[26] *See Certain Crystalline Silicon Photovoltaic Products from Taiwan:  Final Results of Antidumping Duty Administrative Review; 2014-2016*, 82 FR 31555, 31556 (July 7, 2017) (explaining our practice of using a simple average or publicly ranged data when there are only two mandatory respondents, which presents a BPI concern).

[27] *See, e.g.*, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 35481, 35482 (July 6, 2021) (stating that Commerce intends to select respondents based on volume data contained in responses to Q&V questionnaires for the administrative reviews of aluminum extrusions from the People's Republic of China, due to the extremely wide variety of individual types of aluminum extrusion products included in the scope of the orders, which would preclude meaningful results in attempting to determine the largest China exporters of subject merchandise by volume using CBP data).

PT/Pro-Team's zero percent margin and Unicatch and Bonuts' 78.17 percent rates, using the reported POR sales quantity information from PT/Pro-Team and Unicatch and the CBP entry data attributable to Bonuts as the weighting factors, is an appropriate "reasonable method" under section 735(c)(5)(B) of the Act to calculate the rate for non-individually examined respondents. Further, although Unicatch's reported data are not reliable for the purpose of calculating a weighted-average dumping margin for Unicatch based on our application of AFA under section 776(a) and (b) of the Act, we find that Unicatch's reported sales quantity is useable and reliable solely for the limited purpose of identifying the appropriate sales quantity in weight averaging the rate for non-individually examined respondents.[28]

With respect to Bonuts, as stated above, the company was selected as a mandatory respondent and was issued the initial questionnaire but declined to participate in the administrative review. Therefore, Bonuts failed to respond to a request for information and failed to cooperate to the best of its ability, resulting in the application of total AFA under section 776(a) and (b) of the Act in determining a dumping margin for the company. Commerce's preference is to rely on a company's reported sales quantity information to calculate a weighted average for the non-individually examined respondents as directed by the SAA. However, where such information is missing, as is the case here, we may rely on the facts available under section 776(a) of the Act, including the available volume data attributable to Bonuts in the CBP entry data.

---

[28] *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1381 (Fed. Cir. 2016) (recognizing that information on the record that may be unreliable for purposes of calculating a respondent's weighted average dumping margin may be used for other purposes, *i.e.*, corroboration).

## IV.    INTERESTED PARTIES' COMMENTS ON THE DRAFT RESULTS OF REDETERMINATION

On September 15, 2021, we released our Draft Results of Redetermination to interested parties, in which we continued to rely on a simple average of the margins of the three mandatory respondents to determine the rate for the non-individually examined companies.[29]  On September 22, 2021, we received comments from Mid Continent and from the respondent interested parties.[30]  We respond to these comments below.

*Mid-Continent Comments*

- Mid Continent supports Commerce's calculation of the all-others rate based on a simple average instead of a weighted average of the dumping margins calculated for or assigned to three mandatory respondents.[31]

- Given that the dumping margins for all mandatory respondents are zero, *de minimis*, or determined based entirely on facts otherwise available, as is the case here, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated."[32]

- Commerce reasonably determined that the CBP data are not reliable for purposes of calculating a weighted-average all-others rate because the CBP data are significantly different from the quantity and value information provided by mandatory respondents. Although the CBP data were the best available information at the time of, and for the purposes of, respondent selection, significant differences between the respondents' reported

---

[29] *See* Draft Results of Redetermination.
[30] *See* Mid Continent Comments; *see also* Respondent Interested Parties Comments.
[31] *See* Mid Continent Comments at 2.
[32] *Id.* at 2 (citing section 731(c)(5)(B) of the Act).

data and the CBP data call into question the reliability of the CBP data for purposes of calculating a weighted-average all-others rate.[33]

- The use of a simple average has been affirmed by the courts.[34]  For example, *Solianus* held that Commerce acted in accordance with the statute and judicial precedents in calculating an all-others rate using a simple average of the two AFA margins and one *de minimis* margin received by the three mandatory respondents.[35]

- Commerce should continue to calculate the rate for non-individually examined respondents based on a simple average of the dumping margins of the three mandatory respondents.

*Respondent Interested Parties' Comments*

- Section 735(c)(5)(B) of the Act and the SAA authorize Commerce to average a zero percent rate and a total AFA rate to calculate an all-others rate, only provided that such method is reasonable.  Commerce is required to determine a rate which is "reasonably reflective of potential dumping margins for the non-investigated exporter or producers."[36]

- The courts have repeatedly affirmed Commerce's mandate to calculate a reasonable margin for non-investigated respondents.[37]  For example, in *Navneet* and other rulings, the Court has found that Commerce's all-others rate must be supported by substantial evidence.[38]  These judicial decisions overall demonstrate that Commerce cannot blindly rely on the "expected

---

[33] *Id.* at 2.
[34] *Id.* at 3-4 (citing *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (2013); *Solianus*, 391 F. Supp. 3d 1331, 1337-1338).
[35] *Id.* at 4.
[36] *See* Respondent Interested Parties Comments at 3-4.
[37] *See* Respondent Interested Parties Comments at 4-8 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (2013) (*Bestpak*); *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3f 1367, 1378-79 (2012); *Baroque Timber (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1345 (CIT 2014) (*Baroque*); *Shenzhen Xinboda Industrial Co. Ltd. v. United States*, 180 F. Supp. 3d 1305, 1321 (CIT 2016); *Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1362-66 (CIT 2014) (*Navneet*); *Linyi Chengen Imp. & Exp. Co. v. United States*, No. 18-00002, 2020 WL 7488619 (CIT 2020); *Bosun Tools Co. v. United States*, 463 F. Supp. 3d 3109, 1318-19 (CIT 2020) (*Bosun Tools*)).
[38] *See* Respondent Interested Parties Comments at 6.

method" of averaging zero rates and AFA rates in calculating the dumping margin for all other companies, not individually examined.[39]

- Commerce is required by law to determine whether the expected method rate reflects or has some reasonable relationship to the economic reality of the non-individually examined companies, and Commerce did not conduct this analysis in its Draft Results of Redetermination.  It must do so in its final results of redetermination.[40]

- Commerce can rely on a simple average methodology to calculate margins as a last resort when data needed to rely on "accuracy-enhancing" weighted averaging are unavailable.[41] Even if a simple average methodology were legally permissible, it cannot be used unless the result is reasonable and supported by substantial evidence.[42]

- In *Bestpak*, the Federal Circuit stated that to meet the substantial evidence standard, Commerce was required to abide by the "overriding purpose of … calculate{ing} dumping margins as accurately as possible" and to conform to "commercial reality."[43]

- In *MacLean-Fogg Co.*, the Court held that Commerce's reliance on a simple average, rather than a weighted average to calculate an "all-others" rate was "unreasonable in light of the statute's clear preference for the accuracy-enhancing value of weight-averaging and the particular facts of this case."  The Court held that Commerce should reopen the record to obtain evidence necessary to calculate dumping margins.[44]

---

[39] *Id*. at 8.
[40] *Id*. at 8-9.
[41] *See* Respondent Interested Party Comments at 9 and 10.
[42] *Id*. at 9 (citing *Bestpak* at 1377-1380).
[43] *Id*. at 9
[44] *Id*. at 9 (citing *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (CIT 2015) (*MacLean-Fogg Co.*)).

- Simple averaging may be reasonable in certain cases, but this does not mean that the simple average methodology is reasonable as applied to Hor Liang and Romp Coil.[45]  It is possible for the application of a particular methodology to be unreasonable when more accurate methodology is available.[46]

- Commerce cannot apply a punitive AFA rate to cooperative "all others" respondents without establishing that the AFA rate bears some relationship to the "all others" respondents' actual dumping margins.

- Commerce failed to consider whether a 52.11 percent margin was reasonably reflective of Hor Liang and Romp Coil's dumping margin when it applied the rate to these companies.[47]

- Record evidence does not support a finding that a 52.11 percent rate reasonably reflects Hor Liang and Romp Coil's dumping margin.  Commerce calculated a zero percent rate for PT/Pro-Team based on prices and costs from the POR; in contrast, the 78.17 percent rate applied to Unicatch and Bonuts were based on pre-investigation data from 2013 placed on the record by the petitioner with the intent to maximize potential margins.[48]

- Evidence on the record supports a lower rate for Hor Liang and Romp Coil.  The rate applied in the Draft Results of Redetermination is aberrational and punitive, compared to the margins calculated for cooperative respondents in the *Order*, which were rates of zero and 2.16 percent (before this POR), zero (during this POR), and zero and 6.16 percent (immediately after this POR) for Taiwan respondents.[49]

---

[45] *Id.* at 9-10.
[46] *Id.* (citing *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001); and *Bestpak* at 1378).
[47] *Id.* at 10 (citing *Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam:  Antidumping Duty Orders*, 80 FR 39994 (July 13, 2015) (*Order*)).
[48] *Id.* at 11.
[49] *Id.* at 11.

- If Commerce believes that additional information is necessary to obtain a reasonable rate for Hor Liang and Romp Coil, it has the authority to reopen the record to allow parties to submit the data needed.[50]

- Commerce should exclude Bonuts' margin from its calculation of the rate applied to Hor Liang and Romp Coil.  Commerce did not rely on Bonuts' rate in the *Taiwan Nails Final Determination* or First Redetermination, and should not, at this late date, increase the all-others rate by claiming clerical error.[51]  Moreover, Bonuts is not a representative respondent, based on statements made by Bonuts on the record of this administrative review.[52]

- Commerce's reliance on a simple average to calculate the Hor Liang and Romp Coil margin is contrary to law since there is record evidence of CBP import quantities attributable to PT/Pro-Team, Unicatch, and Bonuts in the POR.[53]

- Commerce's conclusion as to the reliability of CBP data used to calculate margins is internally inconsistent and should be rejected in this final redetermination.  If Commerce relies on the 78.17 percent margin, which has no relationship to the POR, it should also find that the CBP data can be used to calculate the rate for Hor Liang and Romp Coil.[54]

- The CBP data attributable to PT/Pro-Team, Unicatch, and Bonuts are clearly reliable since they represent data submitted to a government agency in the ordinary course of business, in which intentionally submitting false data is a crime.[55]  Thus, Commerce cannot reasonably

---

[50] *Id.* at 11 (citing *Bestpak* at 1373; and *MacLean-Fogg* at 1359-64).
[51] *Id.* at 12 (citing *Certain Steel Nails from Taiwan:  Final Determination of Sales at Less Than Fair Value*, 80 FR 28959 (May 20, 2015) (*Nails Taiwan Final Determination*)).
[52] *Id.*
[53] *Id.* at 12.
[54] *Id.* at 13.
[55] *Id.* at 13-14.

conclude that CBP data cannot be used to calculate margins because the CBP data are not corroborated.[56]

- Commerce's calculation of the non-examined companies' rate should not include Bonuts' rate, nor should it rely on a simple average of the mandatory respondents' rates. Commerce should conclude that Hor Liang and Romp Coil's margin is zero percent, or no greater than the investigation rate of 2.16 percent.[57]

**Commerce's Position:** As stated above, section 735(c)(5)(B) of the Act provides that if the estimated weighted-average dumping margins established for all exporters and producers individually examined are zero, *de minimis*, or determined based entirely on facts otherwise available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." The SAA further explains that when "the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis* ... {t}he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided volume data is available. If that method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."[58] The SAA's reference to "other reasonable methods" may include relying on a simple average of the mandatory respondents' zero, *de minimis*, and AFA rates.[59]

---

[56] *Id.* at 14.
[57] *Id.* at 15-16.
[58] *See* SAA at 873.
[59] *See Solianus*, 391 F. Supp. 3d 1331, 1338.

The respondent interested parties argue that Commerce's application of the simple average methodology is not reasonable, as applied, because the resulting rate bears no relation to potential dumping margins for non-individually examined respondents and is not reasonably reflective of their actual dumping behavior.  As discussed above, we have revised our analysis since the Draft Results of Redetermination, and we have now, in this instance, determined the rate for the non-individually examined companies based on the weighted average of the margins of PT/Pro-Team, Unicatch, and Bonuts, using the sales quantities as reported by PT/Pro-Team and Unicatch and the CBP import data attributable to Bonuts as the weighting factors. Accordingly, because we are no longer relying on a simple average of the mandatory respondents' margins, we find that the respondent interested parties' arguments concerning Commerce's simple average calculation methodology are moot.

With respect to the respondent interested parties' arguments that the margin assigned to Bonuts should not be included in determining the rate for the non-individually examined respondents, we continue to find that it is reasonable and appropriate to base the rate of the non-individually examined respondents' rate on the margins of all three mandatory respondents, *i.e.*, PT/Pro-Team, Unicatch, and Bonuts.  Commerce is permitted to limit its individual examination of respondents to a reasonable number of exporters or producers under section 777A(c) of the Act if it determines that it is not practicable to determine individual weighted-average dumping margins for all companies under review because of the large number of exporters or producers involved in the administrative review.  In the underlying review, because of the large number of companies under review, Commerce limited its examination to the exporters or producers accounting for the largest volume of the subject merchandise from Taiwan that it determined

could be reasonably examined.[60]  In doing so, Commerce selected three mandatory respondents, *i.e.*, Bonuts, Unicatch, and PT/Pro-Team, the exporters or producers accounting for the largest volume of the subject merchandise during the POR.[61]  Commerce treats the respondents selected for individual examination as being representative of the non-individually examined companies for purposes of determining the rate applied to the non-individually examined companies under review.[62]  In *Albemarle*, the Court opined that "the very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."[63]  Moreover, the Court stated that, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."[64]  The rates assigned to the mandatory respondents are representative and reasonable unless substantial evidence shows otherwise, whether we had calculated a zero rate, a *de minimis* rate, or assigned to them a rate based entirely on facts available.

In their comments, the respondent interested parties argue that Commerce is required by law to determine whether "the expected method rate reflects or has some reasonable relationship to the economic reality of separate rate companies," since they believe that Commerce has "blindly" relied on the "expected method" of "averaging zero rates and AFA rates in calculating the dumping margin for all other companies, not individually examined."[65]  We disagree.  We

---

[60] *See* Respondent Selection Memorandum at 9.
[61] *See* Respondent Selection Memorandum; *see also* Memorandum, "Antidumping Duty Administrative Review of Nails from Taiwan:  Selection of Additional Mandatory Respondent," dated February 9, 2017.
[62] *See Albemarle v. United States*, 821 F. 3d 1345, 1353 (Fed. Cir. 2016) (*Albemarle*).
[63] *See Albemarle*, 821 F. 3d 1345, 1353.
[64] *See Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 15 C.I.T. 548, 559 (1991).
[65] *See* Respondent Interested Parties Comments at 8.

find that the record evidence does demonstrate that the mandatory respondents are not representative, in accordance with the expected method under the SAA.[66]

With regard to respondent interested parties' claim that Commerce "improperly failed to consider whether a 52.11 percent margin was reasonably reflective of HL/Romp {Coil}'s dumping margin," we disagree.[67]  First, for this final remand redetermination, we calculated a rate for the non-examined companies of 35.30 percent.[68]  Moreover, to the extent that Hor Liang and Romp Coil believe that this argument applies to the calculated weighted average, there has been no indication that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rates of the mandatory respondents were based on AFA.  Additionally, the claim that the 78.17 percent rate does not have "anything to do with HL/Romp {Coil}'s prices and costs in POR 1,"[69] is not substantiated by record evidence.  Hor Liang and Romp Coil argue that the review-specific rate assigned to them does not reflect "economic reality;" however, there is no evidence on this record that the 78.17 percent rate is not reasonable, and parties have not provided any evidence to support their contention that it does not reflect of commercial reality.  In any event, there is evidence that demonstrates that dumping is occurring above the 35.30 percent rate,[70] but Hor Liang and Romp Coil have not provided any evidence that the 78.17 percent margins assigned in the segment of this proceeding have no probative value.  Thus, the evidence on the record does not show that the assumed representativeness (as recognized in *Albemarle*) for mandatory respondents should not

---

[66] *See also Albemarle*, 821 F. 3d 1345, 1353 ("{T}he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.")
[67] *Id.* at 10-11.
[68] *See* Memorandum, "Certain Steel Nails from Taiwan:  Final Remand Redetermination Calculation Memorandum," dated concurrently with this redetermination.
[69] *Id.* at 11.
[70] *See Third Remand Order* at 10-13 (explaining and affirming Commerce's finding that transaction-specific margins from PT/Pro-Team's data corroborated the 78.17 AFA rate).

apply.  We find that the facts here do not present a situation where our methodology is unreasonable or unreflective.

In their comments, respondent interested parties also claim that "evidence on the record supports a lower rate" for Hor Liang and Romp Coil, arguing that the 52.11 percent rate is "aberrational" compared to the calculated margins for cooperative respondents under the *Order*; thereby, making their rate "clearly punitive."[71]  To the extent that respondents believe that this argument applies to the calculated weighted average, we disagree.  Commerce generally does not determine the reasonableness of a rate based upon comparison with rates from previous segments.  Simply because the investigation rates differ from the rates in this administrative review does not, on its face, demonstrate that the rates in this review are not reasonably reflective of the potential dumping margins for the companies not individually examined.[72]  Although the non-examined respondents cite to *Bosun Tools*,[73] which found the history of rates to be evidence, that case is neither final nor precedential.  However, even if we were to consider the previous rates, the respondent interested parties have not presented any evidence that the rates for the individual mandatory respondents in this review are not reasonably reflective of the potential dumping margins for the non-examined respondents, Hor Liang and Romp Coil.  Indeed, neither Hor Liang nor Romp Coil were individually examined in the investigation, and the rates assigned to both Unicatch and Bonuts have been corroborated using PT/Pro-Team's data in this review.  Further, in subsequent reviews Unicatch, Bonuts, and PT/Pro-Team have continued to be

---

[71] *See* Respondent Interested Parties Comments at 11 (stating the five calculated rates before (zero and 2.6 percent), during (zero percent), and immediately after (zero and 6.16 percent) the POR).
[72] *See Taiwan Nails Final Determination*.
[73] *See Bosun Tools*, 463 F. Supp. 3d 1309, 1318–19.

selected as mandatory respondents, and the rates have ranged from 0.00 to 78.18 percent[74]

Bonuts received an AFA rate of 78.17 percent in the second, third, and fourth administrative

reviews, based on its failure to participate.[75]  Unicatch received a 6.16 percent margin in the

second administrative review and a 27.69 percent margin in the third administrative review.[76]

PT/Pro-Team received a *de minimis* rate in the second administrative review, a 6.72 percent

margin in the third administrative review, and an AFA rate of 78.17 percent in the fourth

administrative review.[77]  Further, in the two subsequent reviews for which we determined rates

for non-individually examined companies (including Hor Liang and Romp Coil) the rates were

12.90 percent in the third administrative review and 78.17 percent in the fourth administrative

review.[78]  In sum, there is no evidence that the 35.30 percent rate determined for Hor Liang and

Romp Coil in this review is *not* reasonably reflective of their potential dumping margins; neither

is there evidence that demonstrates that this rate is *clearly* punitive.

　　　　Further, in their comments, respondent interested parties suggest that Commerce has the

authority to reopen the record to allow parties to submit the data needed if it believes that

additional information is necessary to obtain a "reasonable" rate for Hor Liang and Romp Coil.[79]

However, because we find that no additional information is required for Commerce to determine

the rate for the non-individually examined respondents, we do not find that re-opening the record

is necessary.

---

[74] *See Taiwan Nails Final Determination*; *Certain Steel Nails from Taiwan:  Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016-2017*, 84 FR 11506 (March 27, 2019) (Taiwan Nails AR2); *Certain Steel Nails from Taiwan:  Final Results of Antidumping Duty Administrative Review and Determination of No Shipments; 2017-2018*, 85 FR 14635 (March 13, 2020) (Taiwan Nails AR3); *Certain Steel Nails from Taiwan:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 76014 (November 27, 2020) (Taiwan Nails AR4).
[75] *See* Taiwan Nails AR2; Taiwan Nails AR3; Taiwan Nails AR4.
[76] *See* Taiwan Nails AR2; Taiwan Nails AR3
[77] *See* Taiwan Nails AR2; Taiwan Nails AR3; Taiwan Nails AR4.
[78] *See* Taiwan Nails AR3; Taiwan Nails AR4.
[79] *See* Respondent Interested Party Comments at 11.

With respect to the respondent interested parties' argument that Commerce should exclude from its analysis the rate applied to Bonuts, specifically, excluding the AFA rate assigned to Bonuts in its calculation of the rate assigned to the non-individually examined respondents, we disagree.  In the original *Final Results*, we calculated the rate for non-examined companies using all mandatory respondents' rates, including Bonuts.[80]  In the First Redetermination, we continued to calculate the rate for non-examined companies based on a simple average of the mandatory respondents' rates, intending to use all three mandatory respondents' rates.[81]  As part of our reconsideration of our analysis pursuant to the *Second Remand Order*, we noticed that we erred in not including Bonuts' margin in the calculation of the non-individually examined companies' margin in the First Redetermination.[82]  The Court affirmed our ability to correct our ministerial error on remand.[83]  Moreover, although Bonuts may have requested deselection and claimed to be unrepresentative, we continued to treat Bonuts as a mandatory respondent and instead, determined that Bonuts failed to cooperate to the best of its ability.[84]  No party challenged our determination with respect to Bonuts.  Thus, as explained above, Bonuts was properly selected under section 777A(c)(2) and as a mandatory respondent, representative of the non-examined companies.

Further, we find that the letter from Bonuts that is on the record does not provide a basis to consider Bonuts a non-representative respondent.  As noted above, Bonuts failed to cooperate in responding to Commerce's requests for information which would allow Commerce to determine the reliability of its statements.  Thus, the letter from Bonuts contains unsupported

---

[80] *See Final Results* ("we have determined under "any reasonable method" to apply to companies not selected for individual examination in this review the rate determined for all mandatory respondents").
[81] *See* First Redetermination.
[82] *See* Second Redetermination at 12.
[83] *See Third Remand Order* at 21, fn.13.
[84] *See* Bonuts' Letter, "Administrative Review of Antidumping Duty Order on Certain Steel Nails from Taiwan: Request for Deselection (A-583-854)," dated December 27, 2016; *see also Final Results*.

assertions which are insufficient to demonstrate that the assumed representativeness (as recognized in *Albemarle*) of mandatory respondents should not apply, particularly where the record contains volume data of subject merchandise attributable to Bonuts in the form of CBP entry data.  As discussed above, in the absence of a response to our questionnaire from Bonuts, we are relying upon the CBP entry data as facts available under section 776(a) of the Act.  In sum, we disagree with the request to exclude Bonuts.

## V.      FINAL RESULTS OF REDETERMINATION

In accordance with the *Third Remand Order*, we have reconsidered our calculation of the rate assigned to the non-individually examined respondents subject to this litigation. Specifically, we have in this instance revised the rate of the non-individually examined respondents, using a weighted average of the margins of the three mandatory respondents (*i.e.*, PT/Pro-Team, Unicatch, and Bonuts), using the POR sales quantity information reported by PT/Pro-Team and Unicatch and the CBP import data attributable to Bonuts as the weighting factors.

10/13/2021

X _____

Signed by: RYAN MAJERUS

_____
Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties of the
 Assistant Secretary for Enforcement and Compliance