Slip Op. 22-84

# UNITED STATES COURT OF INTERNATIONAL TRADE

PRO-TEAM COIL NAIL ENTERPRISE, INC. AND PT ENTERPRISE INC.,

    Plaintiffs,

UNICATCH INDUSTRIAL CO., LTD, TC INTERNATIONAL, INC., HOR LIANG INDUSTRIAL CORP., ROMP COIL NAILS INDUSTRIES INC., AND PRIMESOURCE BUILDING PRODUCTS, INC.,

    Consolidated Plaintiffs,

and

S.T.O. INDUSTRIES, INC.,

    Plaintiff-Intervenor,

v.

UNITED STATES,

    Defendant,

and

MID CONTINENT STEEL & WIRE, INC.,

    Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 18-00027

## OPINION

[Sustaining Commerce's use of the expected method in its calculation of the non-selected respondents' rate in this antidumping duty review of certain steel nails from Taiwan]

Dated: July 15, 2022

Consol. Court No. 18-00027   Page 2

Ned H. Marshak, Max F. Schutzman, and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Consolidated Plaintiffs Hor Liang Industrial Corp. and Romp Coil Nails Industries Inc.

Sosun Bae, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General and Patricia M. McCarthy, Director. Of counsel on the brief was Vania Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon and Ping Gong, The Bristol Group PLLC, of Washington, DC, for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

  Barnett, Chief Judge: This consolidated action is before the court on the U.S. Department of Commerce's ("Commerce" or "the agency") third remand results in the first administrative review of the antidumping duty order on certain steel nails from Taiwan. *See* Results of [Third] Redetermination Pursuant to Court Remand ("Third Remand Results"), ECF No. 127-1; *see generally Certain Steel Nails From Taiwan*, 83 Fed. Reg. 6,163 (Dep't Commerce Feb. 13, 2018) (final results of antidumping duty admin. review and partial rescission of admin. review; 2015–2016) ("*Final Results*"), ECF No. 20-2, and accompanying Issues and Decision Mem., A-583-854 (Feb. 6, 2018), ECF No. 20-3.[1] The court has previously issued three opinions resolving

---

[1] The administrative record associated with the Third Remand Results is divided into a Public Administrative Remand Record, ECF No. 128-2, and a Confidential Administrative Remand Record, ECF No. 128-3. Parties submitted joint appendices containing record documents cited in their comments on the Third Remand Results. *See* Confidential Third Remand J.A. ("RCJA"), ECF No. 136; Public Third Remand J.A. ("RPJA"), ECF No. 137. The court references the confidential version of the relevant record documents, unless otherwise specified. The RCJA and RPJA also contain documents from the administrative record associated with the *Final Results*, which was divided into a Public Administrative Record ("PR"), ECF No. 20-4, and a Confidential

substantive issues in this case; familiarity with these opinions is presumed. *See Pro-Team Coil Nail Enter. v. United States* ("*Pro-Team III*"), 45 CIT __, 532 F. Supp. 3d 1281 (2021); *Pro-Team Coil Nail Enter. v. United States* ("*Pro-Team II*"), 44 CIT __, 483 F. Supp. 3d 1242 (2020); *Pro-Team Coil Nail Enter. v. United States* ("*Pro-Team I*"), 43 CIT __, 419 F. Supp. 3d 1319 (2019).

After three remand determinations, the issue remaining before the court is whether Commerce properly determined the antidumping duty rate to be applied to respondents that were not selected for individual examination (i.e., the non-selected respondents). As discussed below, pursuant to these remand determinations, Commerce has assigned rates based on total adverse facts available[2] to two selected respondents, calculated a zero percent margin for a third selected respondent, and calculated the weighted average of these three rates to apply to the non-selected respondents. Some of the non-selected respondents, Hor Liang Industrial Corp. and

---

Administrative Record ("CR"), ECF No. 20–5. The court also cites to documents from the Confidential Joint Appendix ("CJA"), ECF No. 55, previously submitted to the court in conjunction with the parties' Rule 56.2 filings.

[2] The phrase "adverse facts available" (or "AFA") is often used by parties and Commerce to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. In order to rely on AFA, Commerce must first identify why it needs to rely on facts otherwise available, and second, must explain how a party failed to cooperate to the best of its ability so as to warrant the use of an adverse inference when selecting from those facts. *See* 19 U.S.C. § 1677e(a)–(b). "Total adverse facts available" refers to situations in which Commerce finds that none of a party's reported information is reliable or useable and, because of that party's failure to cooperate to the best of its ability, that Commerce must use an adverse inference with respect to all categories of reported information. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citation omitted); *see also Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F. Supp. 3d 1356, 1374 (2019).

Consol. Court No. 18-00027 Page 4

Romp Coil Nails Industries (together, "Plaintiffs") challenge that rate as not reasonably reflective of their potential dumping margins and, therefore, not based on substantial evidence. Confidential Consol. Pls.', Hor Liang Indus. Corp. & Romp Coil Nails Indus. Inc., Cmts. on Redetermination ("Opp'n Cmts.") at 6–10, ECF No. 129. Defendant United States and Defendant-Intervenor Mid Continent Steel & Wire, Inc. submitted comments urging the court to sustain the rate calculated in the Third Remand Results. *See generally* Confidential Def.'s Resp. to the [Opp'n Cmts.], ECF No. 134; Def.-Int. Mid Continent Steel & Wire, Inc.'s Cmts. in Support of [Third Remand Results], ECF No. 133.

For the reasons that follow, the court affirms Commerce's determination of the non-selected respondents' rate using the so-called expected method.[3]

## BACKGROUND

In this administrative review, Commerce selected three respondents for individual examination (i.e., the "mandatory respondents"): Pro-Team Coil Nail Enterprise, Inc. ("Pro-Team"); Unicatch Industrial Co., Ltd. ("Unicatch"); and Bonuts Hardware Logistics Co., LLC ("Bonuts"). Third Remand Results at 3. Commerce initially used AFA (the petition rate) to determine the dumping rates for each of the mandatory respondents. *See id.* at 3. Bonuts did not challenge the AFA rate it was assigned. *See Pro-Team I*,

---

[3] As explained in greater detail below, the "expected method" refers to the preferred method for calculating all-others rates when individually investigated exporters and producers receive dumping margins that are zero, *de minimis*, or based on facts available. In such instances, Commerce is expected to calculate the all-others rate by using a weighted average of the rates assigned to the individually investigated parties.

419 F. Supp. 3d at 1323–25.  Over the course of this litigation, Commerce continued to use the AFA rate for Unicatch and calculated a dumping margin of zero percent for Pro-Team, each of which has been sustained by this court.  *See Pro-Team III*, 532 F. Supp. 3d at 1294 (sustaining Commerce's selection of the petition rate as AFA for Unicatch); *Pro-Team II*, 483 F. Supp. 3d at 1252 (sustaining Commerce's calculation of a zero percent dumping margin for Pro-Team).  To calculate the non-selected respondents' rate, in the second remand results, Commerce used a simple average of the mandatory respondents' rates.  *See* Final Results of [Second] Redetermination Pursuant to Court Remand at 12, ECF No. 99-1.

In *Pro-Team III*, the court remanded Commerce's use of a simple average to calculate the rate for non-selected respondents.  532 F. Supp. 3d at 1294.  The court found that substantial evidence did not support Commerce's departure from the "expected method" (i.e., using a weighted average to calculate the non-selected respondents' rate) because Commerce had not explained why the U.S. Customs and Border Protection ("CBP") import volume data it had relied on for selecting mandatory respondents was not reliable for the purpose of calculating a dumping rate using the "expected method."  *Id*. at 1293–94.

In the Third Remand Results, Commerce determined that it was feasible to rely on the CBP import volume data.  Third Remand Results at 7–8.  Thus, Commerce determined the dumping margin for non-selected respondents by calculating a weighted average of the margins of the mandatory respondents.  *Id*.  This use of the expected

method resulted in an antidumping duty rate of 35.30 percent for the non-selected respondents. See id. at 17.

Commerce explained that this rate was reasonably reflective of Plaintiffs' dumping margins because there was no indication that mandatory respondents were not representative of non-selected companies. Id. Commerce also explained that there was no evidence that the 35.30 percent rate was not reasonably reflective of Plaintiffs' dumping margins because Plaintiffs were not individually examined in the investigation, and the rate assigned to both non-cooperating mandatory respondents had been corroborated using data from Pro-Team. See id. at 18. Commerce further found that there was no evidence that the rate determined using the expected method was punitive. Id. at 18–19.

Commerce rejected Plaintiffs' arguments that Bonuts' margin should not be included in determining the rate for non-selected respondents. Id. at 15. Commerce stated that Bonuts was chosen as a mandatory respondent because it was an exporter or producer accounting for the largest volume of subject merchandise during the period of review, and that case law supported the assumption that mandatory respondents are representative of non-examined respondents absent substantial evidence to the contrary. Id. at 15–16.

Finally, Commerce rejected Plaintiffs' suggestion that it should reopen the record to allow parties to submit data "necessary to obtain a 'reasonable' rate for [Plaintiffs]." Id. at 19. Commerce explained that no additional information was required to determine the non-selected respondents' rate. Id.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[4] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

At issue is whether Commerce's use of the expected method to determine the non-selected respondents' rate is supported by substantial evidence and otherwise in accordance with law when Commerce calculated the rate in part using AFA rates assigned to mandatory respondents. The court recently addressed a similar issue in an opinion dismissing a challenge to the results of the fourth administrative review of this order. *See PrimeSource Bldg. Prods., Inc., v. United States*, Slip Op. 22-73, 2022 WL 2176270 (CIT June 16, 2022). The court incorporates and restates much of the reasoning articulated in that opinion in rejecting Plaintiffs' challenge to the Third Remand Results.

I.  **Legal Framework**

The statute is silent regarding how to determine the rate for companies not selected for individual examination in an administrative review. In determining the rates

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless stated otherwise.

Consol. Court No. 18-00027                                                                                    Page 8

for such companies, Commerce looks to 19 U.S.C. § 1673d(c)(5) for guidance.[5]  *See, e.g.*, *Albemarle*, 821 F.3d at 1352 & n.6.  Section 1673d(c)(5)(A) provides that the "all-others rate" assigned to non-examined companies is calculated as "the weighted average of the estimated weighted average dumping margins" assigned to individually-examined companies, "excluding any zero and *de minimis* margins, and any margins determined entirely under section 1677e of this title [i.e., on the basis of adverse facts available]."  19 U.S.C. § 1673d(c)(5)(A).

When the dumping margins assigned to all individually examined companies are zero, *de minimis*, or based on facts available, the statute further provides that Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  *Id.* § 1673d(c)(5)(B).

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which Congress has approved as an authoritative interpretation of the

---

[5] By its terms, 19 U.S.C. § 1673d applies to market economy investigations, not administrative reviews.  As a general rule, however, Commerce looks to § 1673d(c)(5) for guidance when calculating the rate for non-examined companies in administrative reviews—be it the "all-others" rate in a market economy proceeding or the "separate rate" in a non-market economy proceeding.  *See, e.g., Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 & n.6 (Fed. Cir. 2016).  Jurisprudence for determining the rate applicable to non-selected, separate rate respondents in a nonmarket economy proceeding is relevant to determining non-selected respondents' rates in a market-economy proceeding.  *See id.* at 1373–74 (discussing the market-economy rule alongside the nonmarket-economy rule); *Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL 94172, at *2–3 & n.2 (Fed. Cir. Jan. 10, 2022) (unpublished) (same).

statute, *id.* § 3512(d), provides an "expected method" to determine the all-others rate in these situations, Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA"). When the dumping margins for all individually investigated exporters and producers are determined entirely on the basis of facts available or are zero or *de minimis*, "[t]he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." *Id.* The SAA further provides that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *Id.*

As the court discussed in *PrimeSource*, 2022 WL 2176270, at *4–7, prior litigation surrounding these statutory provisions and corresponding portions of the SAA provides the backdrop to the court's consideration of this issue. Case law confirms that when Commerce relies on 19 U.S.C. § 1677f-1(c)(2) to select the largest exporters by volume for individual examination, it does so based on a statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters. *See Albemarle*, 821 F.3d at 1353; *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017). This respondent selection exercise occurs early in the administrative proceeding before questionnaires are issued and is based on the respondents' export volumes, not the results of the agency's dumping margin analysis. *See* Mem. Regarding Selection of Additional Mandatory

Respondent (Feb. 9, 2017) at 1–3, PR 76, CJA Tab 17; Respondent Selection Mem. (Nov. 29, 2016) ("Selection Mem.") at 1, 7–8, CR 6, PR 38, RCJA Tab 2.  In other words, the selected respondents are assumed to be representative of the non-selected respondents without regard to whether their final antidumping duty margin is zero, *de minimis*, based entirely on the use of AFA, or calculated based on the questionnaire responses of the selected respondents.  See *Albemarle*, 821 F.3d at 1353; *Bosun*, 2022 WL 94172, at *4.

Furthermore, this assumption of representativeness carries weight when Commerce determines the rate applicable to non-selected respondents.  As mentioned above, Commerce determines the rate for non-selected respondents consistent with 19 U.S.C. § 1673d(c)(5).  Thus, Commerce will weight-average the above-*de minimis* calculated rates to determine the non-selected respondent rate.  19 U.S.C. § 1673d(c)(5)(A).  However, if the rates for all selected respondents are zero, *de minimis*, or based on facts available, the SAA provides that the expected method is for Commerce to weight-average such rates to determine the non-selected respondents' rate.  SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  That is to say, it is *expected* that zero, *de minimis*, and facts available rates will be used in determining the non-selected respondents' rate.  See *id.*; *Bosun*, 2022 WL 94172, at *4 (rejecting the appellants' argument that Commerce unreasonably based the separate rate, in part, on an AFA rate as "expressly foreclosed by statute").

*Albemarle* and *Changzhou Hawd* confirm that the expected method is the default method and that the burden of proof lies with the party seeking to depart from the

expected method (or with Commerce as the case may be). In *Albemarle*, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") concluded that "[t]he burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents." *Id.* In that case, however, Commerce sought to deviate from the expected method; thus, the appellate court held that "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Id.*

One year after the court's decision in *Albemarle*, the Federal Circuit again confirmed the relevance of the assumed representativeness of the mandatory respondents in *Changzhou Hawd*. *See Changzhou Hawd*, 848 F.3d at 1012 ("The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."). The court again found that in order to depart from the expected method, Commerce must identify substantial evidence that the non-selected respondents' dumping was different from that of the mandatory respondents. *See id.* ("[T]he presumption of representativeness may be overcome . . . [with] 'substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different.'") (quoting *Albemarle*, 821 F.3d at 1353).

Recently, in *Bosun*, the Federal Circuit confirmed that the representativeness of the selected respondents is independent of the results of Commerce's dumping margin

analysis.6  *See* 2022 WL 94172, at *4.  In the review underlying *Bosun*, Commerce selected the two largest respondents for examination and calculated a *de minimis* dumping margin for one respondent while basing the other respondent's rate on AFA.  *Id.* at *2–3.  Commerce determined the rate for the non-selected respondents by finding the simple average of these two rates.7  *See id.* at *3.  The *Bosun* court affirmed Commerce's inclusion of the AFA-based rate in the average assigned to the non-selected respondents.  *See id.* at *4.  In so doing, the court recalled its discussion in *Albemarle* regarding the "general assumption underlying the statutory framework"—specifically, the assumption that data from the largest volume exporters may be viewed as representative of all exporters, *id.* (quoting *Albemarle*, 821 F.3d at 1353)—and went on to find that "although *Albemarle* concerned a case with *de minimis* rates rather than AFA rates, its reasoning is equally applicable here; the same statutory language in [section] 1673d(c)(5)(B) that permits use of *de minimis* rates also permits use of AFA rates," *id.* (emphasis added).8

---

6 Although *Bosun* is an unpublished opinion, as discussed herein, this court finds the opinion helpful to its analysis because the reasoning is consistent with and builds on the Federal Circuit's prior reasoning in *Albemarle* and *Changzhou Hawd* and is otherwise persuasive.

7 By using the simple average, Commerce diverged from the expected method, which calls for using the weighted average of the selected respondents' rates.  SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  Commerce may have used a simple average of the two respondents' rates (in other words, giving equal weight to each rate) in order to avoid revealing the actual volume of imports into the United States by the cooperating respondent if such information was considered business proprietary.  Regardless, the Federal Circuit did not fault Commerce's use of a simple average.

8 In a precedential opinion, the Federal Circuit recently upheld Commerce's use of the expected method to determine the non-selected respondents' rate using the AFA rates

These cases all recognize an important assumption that is built into Commerce's statutory authority to engage in respondent selection: that the largest exporters by volume are assumed to be representative of the non-selected respondents. Consistent with this assumption, the cases also stand for the proposition that Commerce is expected to use the mandatory respondents' rates to determine the antidumping duty rate to be assigned to the non-selected respondents.

These concepts, representativeness and expectedness, are connected. Representativeness allows Commerce to select certain respondents for individual examination and, in so doing, decline to individually examine other respondents. By allowing Commerce to focus its resources on certain respondents, the statute necessarily creates the assumption of representativeness because Commerce often will lack further information about the non-selected respondents. *See Albemarle*, 821 F.3d at 1353. Commerce is not otherwise required to collect information about the non-selected respondents because Commerce is permitted, in fact, expected, to treat the mandatory respondents as representative of the non-selected respondents when it determines the non-selected respondents' rate.

This assumption of representativeness, combined with the expectation that Commerce will treat the mandatory respondents as representative of the non-selected respondents, provides a basis for understanding the SAA language, which states that "if

---

of mandatory respondents in an administrative review of an antidumping duty order involving a nonmarket economy country. *Shanxi Hairu Trade Co. v. United States*, No. 2021-2067, 2022 WL 2443960, at *5 (Fed. Cir. July 6, 2022).

[the expected] method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-[examined] exporters or producers, Commerce may use other reasonable methods." SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.

As discussed above, the statute clearly permits Commerce to engage in a respondent selection process pursuant to 19 U.S.C. § 1677f-1(c) when certain conditions have been met. Commerce engaged in that process in this administrative review and no party challenges that decision. Having determined to examine the largest exporters by volume in this review, the statute permits Commerce to proceed with the review without requiring additional information from the non-selected respondents. *See, e.g.*, *Changzhou Hawd*, 848 F.3d at 1012 (discussing the statutory authority to select respondents rather than examining every exporter). This SAA language does not require Commerce to engage in a data collection exercise with the non-selected respondents in order to determine their "potential dumping margins" because such an exercise would be inconsistent with the language of 19 U.S.C. § 1677f-1(c) expressly permitting Commerce to "limit[] its examination" to the largest exporters and producers by volume. 19 U.S.C. § 1677f-1(c)(2). Such an interpretation would defeat the purpose of the respondent selection process. Nothing in the statute, SAA, or jurisprudence suggests that such a burden exists.

To the contrary, the courts have long recognized that the burden of establishing relevant facts may properly be assigned to the party in control of the information necessary to establish those facts. *See, e.g.*, *Rhone Poulenc, Inc. v. United States*, 899

F.2d 1185, 1190–91 (Fed. Cir. 1990) (placing "the burden of production on the [party] which has in its possession the information capable of rebutting the agency's inference"). Thus, when, as here, the non-selected respondents are in control of the information that would establish whether applying the expected method based on the rates of the mandatory respondents would not reasonably reflect the potential dumping margins of those non-selected respondents, the non-selected respondents bear the burden of providing such evidence.

## II. Analysis

The court now turns to whether substantial evidence supports Commerce's use of the expected method. Commerce found that there was "no indication that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rates were based on AFA."[9] Third Remand Results at 17. While Plaintiffs argue that the record shows that the mandatory respondents were not representative of Plaintiff's dumping margins, *see* Opp'n Cmts. at 6–9, Commerce considered their arguments and concluded that Plaintiffs did not identify evidence to support their assertion that the rate assigned to non-selected respondents in this review is not reasonably reflective of their potential dumping margins, Third Remand Results at 15–19.

---

[9] Elsewhere in the Third Remand Results, Commerce erroneously stated that "the record evidence does demonstrate that the mandatory respondents are not representative." Third Remand Results at 17. This appears to be a misstatement, as the discussion that follows contemplates the mandatory respondents being representative. *Id*. at 17–18.

  Plaintiffs argue that the 35.30 percent rate assigned to non-selected respondents is punitive and "aberrational compared to margins calculated for cooperative respondents" in the periods before, during, and immediately after this administrative review. Opp'n Cmts. at 6–8. While it is true that some mandatory respondents cooperated in this and subsequent administrative reviews, resulting in calculated rates lower than 35.30 percent, *see* Final Results of [First] Redetermination Pursuant to Court Remand at 6–8, 32 (zero percent margin for Pro-Team), ECF No. 71-1; *Certain Steel Nails From Taiwan*, 84 Fed. Reg. 11,506, 11,507 (Dep't Commerce Mar. 27, 2019) (final results of antidumping admin. review and partial rescission of admin. review; 2016–2017) ("*AR2 Final Results*") (dumping margins of zero percent and 6.16 percent for Pro-Team and Unicatch, respectively), Plaintiffs ignore that during the same administrative reviews, Unicatch was assigned an AFA rate once, and Bonuts twice received an AFA rate, *see Final Results*, 83 Fed. Reg. at 6,164; *AR2 Final Results*, 84 Fed. Reg. at 11,507. Moreover, in these Third Remand Results, Commerce explained that the fact that rates from the investigation and other administrative reviews differed from the rate in this administrative review did not, "on its face, demonstrate that the rates in this review are not reasonably reflective of the potential dumping margins for the companies not individually examined." Third Remand Results at 18. Commerce explained that the non-selected respondent rate was not aberrant, noting that Plaintiffs failed to provide any evidence that the weighted average of the mandatory respondents' rates was not reasonably reflective of the potential dumping margins for non-examined respondents, *see id.*, and that, furthermore, the AFA rates on which the non-selected respondent rate

was based in part had been corroborated using data provided by Pro-Team, *see id*. at 17.

      Plaintiffs cite to *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010), to support their claim that the rates in this review are aberrantly high when compared to the rates calculated for cooperative respondents in both the investigation and subsequent administrative reviews. Opp'n Cmts. at 8. In *Gallant Ocean*, the Federal Circuit held that it was unreasonable for Commerce to assign to a non-cooperating exporter a rate five times higher than the next highest assigned or calculated rate in the same review, and the rate was thus "punitive, aberrational [and] uncorroborated." 602 F.3d at 1323–24. Reliance on *Gallant Ocean* is misplaced. In *Gallant Ocean*, the plaintiff directly challenged the AFA rate assigned to it, not an all-others rate calculated using AFA rates received by mandatory respondents. 602 F.3d at 1322. Here, the 35.30 percent rate for non-individually examined respondents is not the highest rate determined in this administrative review; the AFA rates of 78.17 percent received by Unicatch and Bonuts are the highest rates determined during this administrative review. *See* Third Remand Results at 3–4, 17. Furthermore, while Plaintiffs would like to disregard the 27.69 percent calculated rate received by Unicatch in a subsequent review, *see* Opp'n Cmts. at 7–8; *Certain Steel Nails From Taiwan*, 85 Fed. Reg. 14,635, 14,636 (Dep't Commerce Mar. 13, 2020) (final results of antidumping duty admin. review and determination of no shipments; 2017–2018) ("*AR3 Final Results*"), that rate is comparable to the 35.30 percent rate Plaintiffs contest here. While that rate was received in the third administrative review, *see AR3 Final Results*,

Consol. Court No. 18-00027 Page 18

85 Fed. Reg. at 14,636, to the extent that Plaintiffs seek to cherry-pick rates from subsequent administrative reviews to further their arguments, the court will not ignore other rates from those reviews that cut against Plaintiffs' contentions.

Plaintiffs also contend that Commerce should have excluded Bonuts' data from its calculation of the non-selected respondents' rate because record evidence showed that Bonuts was not a representative respondent. Opp'n Cmts. at 9. Although Bonuts requested deselection as a mandatory respondent and indicated that it believed that it was "not representative of the business models of Taiwan nails producers," *see* Request for Deselection (Dec. 27, 2016), PR 55, RCJA Tab 3; *see also* Third Remand Results at 20, Commerce determined that Bonuts failed to cooperate to the best of its ability—a determination that was not challenged, Third Remand Results at 20. Commerce declined to rely on Bonuts' statement because, absent Bonuts' cooperation, Commerce was not able to verify Bonuts' claim that it was not representative. *Id*. at 20–21. The court finds that Commerce's determination to include Bonuts' data in its calculation of the non-selected respondents' rate is supported by substantial evidence.

Substantial evidence also supports Commerce's rejection of Pro-Team's argument that Bonuts' entries were not classified as the same "entry type" as those made by other Taiwanese exporters of steel nails and, therefore, were not representative. See PT's and Unicatch's Comments on [CBP] Data ("Respondent

Selection Cmts.") (Oct. 6, 2016), CR 3, PR 30, RCJA Tab 1.[10]  Commerce rejected this distinction as irrelevant because both entry types were subject to the antidumping duty order.  See Selection Mem. at 7–8.  Because both entry types are subject to the antidumping duty order, it follows that Commerce would include both in its respondent selection process.  The court finds no error in this analysis by Commerce.

      Finally, Plaintiffs ask the court to order Commerce to reopen the record to obtain additional data to calculate the non-selected respondent rate.  See Opp'n Cmts. at 10.  While Commerce retains significant discretion to determine whether to reopen the record on remand, in most cases, this is not something the court will require simply based on a plaintiff's argument that better information is available.  It is incumbent upon parties to provide relevant information in accordance with the agency's procedures and deadlines.  The interests of finality suggest that the court should limit interfering with those procedures and deadlines.  See, e.g., *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554 (1978); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1327, 1338 (2017).  Having found that substantial evidence supports Commerce's use of the expected method to calculate the rate for non-individually examined respondents, the court agrees with Commerce's

---

[10] Specifically, Pro-Team noted that it and Unicatch were the two largest importers of nails from Taiwan based on the entry type used for entries subject to antidumping or countervailing duties.  Respondent Selection Cmts. at 3.  Pro-Team argued that Commerce should not include an additional entry type in its respondent selection analysis.  See id. at 3–4.  It was the inclusion of that additional entry type that moved Bonuts to its rank as the second largest exporter of subject merchandise.  See id.  Pro-Team argued that because Bonuts' entries were of a different type, Bonuts was not representative and should not be selected as a mandatory respondent.  See id.

determination that "no additional information is required for [it] to determine the [Plaintiffs' rates]."[11]  Third Remand Results at 19.  There is a "statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters."  *PrimeSource*, 2022 WL 2176270, at *4; *see also Albemarle*, 821 F.3d at 1353; *Changzhou Hawd*, 848 F.3d at 1012.  As discussed above, 19 U.S.C. § 1677f-1(c) permits Commerce to engage in respondent selection when certain conditions have been met, and no party challenges that decision.  Having determined to examine the largest exporters by volume in this review, Commerce was under no statutory obligation to solicit or obtain additional information from the non-selected respondents.

## CONCLUSION

Based on the foregoing, the court will sustain Commerce's Third Remand Results.  Judgment will enter accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: July 15, 2022
New York, New York

---

[11] Plaintiffs cite to *MacLean-Fogg Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1349, 1363 (2015), to support its argument that the court should direct Commerce to reopen the record.  Opp'n Cmts. at 10.  Plaintiffs misread the opinion.  First, the court in *MacLean-Fogg* did not mandate that Commerce reopen the record.  *MacLean-Fogg Co.*, 100 F. Supp. 3d at 1363.  Furthermore, the *MacLean-Fogg* court remanded the final determination in the investigation to Commerce because the court found that necessary data in the form of public summaries and ranged figures in the public version of submissions was absent from the record "due to Commerce's own failure to fully administer the legal framework."  *Id*.  Similar circumstances do not exist here—the court finds that Commerce had all necessary data that it was required to obtain to calculate the non-selected respondents' rate using the expected method.